FRANCES E. STOKEY, *Admx., Etc.*

*v.*

NORFOLK AND WESTERN RAILWAY COMPANY, *et al.*

(No. 10101)

Submitted April 19, 1949. Decided May 24, 1949.

772

*Crockett & Tutwiller, J. S. Crockett,* for plaintiffs in error.

*B. F. Howard,* for defendant in error.

RILEY, JUDGE:

Frances E. Stokey, administratrix of the estate of Mary M. Stokey, deceased, instituted in the Circuit Court of McDowell County this action of trespass on the case for the alleged wrongful death of plaintiff's decedent against the Norfolk and Western Railway Company and B. A. Neal, the railway company's brakeman. To a judgment in the amount of ten thousand dollars based upon a jury verdict this writ of error and supersedeas is prosecuted.

The instant verdict is the result of a second trial of the action. The circuit court set aside a jury verdict rendered in the first trial in favor of plaintiff, and this Court refused to grant a writ of error to such action of the court.

Between ten and eleven o'clock on the morning of February 12, 1947, the weather being bitterly cold and windy, plaintiff's decedent, aged seventy-four, but active and alert for her years, and with no impairment of hearing or vision, was struck and fatally injured by a mixed three-car train while she was proceeding in a westerly direction along the eastbound track of defendant railway company's main line on a railroad bridge which spans Elkhorn Creek, at the western end of a deep cut, known as "Dead Man's Cut" between the towns of Keystone on the west and Northfork on the east.

The railroad bridge is of heavy steel construction, $82\frac{1}{2}$ feet in length, and is traversed by the eastbound and west-

bound main tracks of defendant railway company. The curvature of the railway tracks through the cut and on the bridge is twelve degrees, and the grade over which defendant railway company's train was running in a generally easterly direction is 52/100 of 1%. Throughout the entire length of the bridge a heavy steel girder separates the eastbound and westbound tracks. A like girder borders each side of the bridge. Thus the bridge is divided into two parts so that one using, as decedent was doing at the time she was fatally injured, the eastbound track could not upon the approach of an eastbound train step on the westbound track for safety. At each end of the bridge there is a concrete abutment. Between these abutments are five steel floor beams, extending the entire width of the bridge and supporting the rails and ties of both tracks. These floor beams are 12¾ inches wide, the one nearest the western concrete abutment of the bridge being 9.25 feet east thereof. Supporting the joinder of the southerly girder with the floor beam nearest the eastern concrete abutment, there is a gusset. From the southerly guardrail of the eastbound track, where Neal said he first saw decedent standing or walking, to the gusset is five feet and it is three feet, nine inches from the end of the ties. The record discloses that if, on the approach of the train, decedent had gone out on the floor beam nearest her and held to the gusset, she would not have been struck. After decedent was struck, her body was found between the western abutment and the floor beam nearest thereto on the bed of the stream about "3 or 4 feet from the west end of the bridge, practically at the end." At that point the bed of the stream is about six feet below the top of the ties.

Deep in the cut there is an electrification tower 250 feet west of the western abutment of the bridge, and, approximately 214 feet east from the place where decedent's body was found after she was struck, there is another electrification tower designated in the record as the "First Electrification Tower." Immediately west of the western abutment of the bridge, and directly east of the cut there is a steep well-worn footpath which leads to a wide and

well-paved road known as State Route No. 52, which parallels the railway and runs between Keystone on the west and Northfork on the east. Likewise there is an unimproved road not more than ten feet wide, which substantially parallels the railroad on the north side and extends between the two towns. Plaintiff adduced evidence to the effect that this road during the winter is not a desirable route for foot passage. It, however, affords a shorter distance from decedent's then home in Burke Hollow, a short distance north of the railroad to either Keystone or Northfork.

The record discloses, without substantial contradiction, that at all times of the day and night, men, women and children are wont to use the bridge, despite the fact that there is a large sign at each end of the bridge reading "DO NOT WALK NOR TRESPASS ON THE BRIDGE." Evidence was adduced, over objection of the defendants, that employees of the Koppers Coal Company, living north of defendant railway company's main tracks, were accustomed to use the defendant railway company's bridge and proceed over the footpath to busses awaiting them on Route 52 in going to work, and that they returned in the same manner.

Decedent lived with her daughter, Frances Stokey, in Burke Hollow. She was accustomed almost daily, if not daily, to proceed by walking down the hollow past a house occupied by plaintiff's witnesses, Mr. and Mrs. Edward Donnelly, located 125 feet from the eastern end of the bridge, in making shopping trips either to Keystone or Northfork. In doing so it was her custom, on occasions at least, to go along the road she was using past the Donnelly home, over a well-worn footpath immediately east of the eastern abutment of the bridge across the westbound track, and then on the eastbound track across the bridge for the purpose of reaching Route No. 52 by the footpath at the other end of the bridge, although her daughter had frequently remonstrated with her about this and had asked her not to use defendant railway company's bridge.

This record further discloses that the stream was turbulent and its bed rocky; that as decedent, who was five feet tall, or less, was proceeding across the bridge, she was dressed in black with her head covered with a very heavy shawl. Whether in these circumstances decedent heard, or could have heard, the approach of defendant railway company's train before it came into sight, cannot, with any degree of satisfaction, be gleaned from this record.

Defendant railway company's train was made up or consisted of a vestibule passenger coach, a combination passenger and baggage coach, and a freight car about half loaded, with an engine pushing from the rear. According to defendants' witness, F. R. Litz, division road foreman of engines for defendant railway company, the train was 234 feet long, but civil engineer, L. A. Hornby, a witness for plaintiff, testified that by actual measurement it was 283 feet long. The vestibule passenger coach was in the lead; the combination car was next; and the freight car was between the combination car and the locomotive. As the train rounded the curve in the cut and proceeded toward the bridge, according to the testimony of Neal, the head brakeman, and that of defendants' witness, Claude W. McReynolds, a learner brakeman, who was standing inside the lead car immediately behind the door, Neal was standing in the front of the vestibule near and just behind the chain extending across the opening of the vestibule. L. E. Dotson, a passenger brakeman on the train, was in the combination car in the act of proceeding toward and into the lead coach. S. A. Parks, the train conductor was in the combination car preparing his report. J. E. Douthit, the engineer, was seated in the engineer's seat on the right of the locomotive; and the fireman, Ernest Epling, was seated in his accustomed seat on the left side of the cab of the engine.

Neal testified that when he first saw decedent she was on the wooden guardrail south of the eastbound track, ten or twelve feet from the western end of the bridge; and that he immediately turned, opened the door of the coach

and pulled the emergency cord located directly behind the door, throwing the brakes of the train into emergency. McReynolds testified that when he first saw decedent, she was walking in the center of the eastbound track facing the train, hurrying along as if she was trying to get off the bridge, and was then about six ties from the western end of the bridge, which witness estimated to be about ten or twelve feet. This witness testified that Neal suddenly raised his hand, turned, opened the door leading from the vestibule, pushed witness aside and pulled the emergency cord. McReynolds did nothing to stop the train, because he had not been trained as a passenger brakeman and knew nothing about the emergency cord. The passenger brakeman, L. E. Dotson, says that just as he was coming into the lead coach from the combination car, he saw Neal open the door leading from the front vestibule, reach up and pull the emergency cord. These members of the train crew are corroborated to some extent by the testimony of the train conductor, engineer and fireman, who testified to the effect that they heard the application of the emergency brakes when the train was rounding the curve well within the cut.

But the testimony of defendants' witnesses as to Neal's position on the train, and his actions in regard to the application of the emergency brakes is not without substantial contradiction. Edward Donnelly and his wife both testified for plaintiff that they say the approach of the train, as it came through the cut toward the bridge, the former looking out of the window in the front room of the Donnelly house, which was situated on a slight elevation 125 feet north of the eastern end of the bridge, and along the road leading from decedent's home in Burke Hollow to the unimproved road on the northerly side of the tracks between Keystone and Northfolk. Mrs. Donnelly testified she was looking through the kitchen window of the Donnelly house. Donnelly testified that he saw Mrs. Stokey with her head wrapped in a heavy shawl pass in front of the house forty or fifty feet away, going in the direction of the tracks; that she was proceeding up the small path

to the westbound track of defendant railway company's main line; thence, after looking in both directions, she walked across the westbound track and, again looking in both directions, went on the eastbound track and proceeded across the bridge in a westerly direction; but that as she came on the bridge, due to the height of the steel girders and her small stature, she was lost to view of both witnesses. Donnelly testified that he saw the train approaching around the curve in the cut a distance of three or four hundred feet from the western end of the bridge; that as the train came in sight, he saw the brakeman, evidently Neal, clad in gray overalls and a blue shirt, standing in the vestibule of the lead coach "leaning against the side of the door with his left shoulder"; that no warning signal was given by the train; that he had Neal in view from the time the lead coach came into view until it started across the bridge; that during all of that time Neal made no move, but remained standing in the vestibule of the car at the same place where witness first observed him; that the train as it approached the bridge was going about ten miles an hour; that the speed of the train was not slackened until after it reached the bridge; and, finally, that the train did not come to a stop until the engine had gone past the first electrification tower, which, according to plaintiff's witness Hornby, a civil engineer, was about 220 feet from the western abutment of the bridge. Mrs. Donnelly testified that she saw Neal through the kitchen window standing in the door at the front end of the train, and that from the time the train first came into sight, when it rounded the curve, until she lost view of Neal, as the train crossed the bridge, he remained standing at the place where she first saw him and made no apparent move to stop the train or enter the coach, as Neal, McReynolds, and Dotson testified he did, nor was the speed of the train slackened until the bridge was reached.

The testimony of the Donnellys to the effect that Neal made no effort to stop the train until it had started over the bridge is corroborated to a large extent by the testimony of the members of the train crew, as to the position

of the locomotive after the train came to a stop, coupled with the testimony of defendants' expert witnesses às to the distance within which the train could have been stopped. The members of the train crew testified variously that the locomotive came to a stop from ninety feet west of the eastern abutment of the bridge to a position just over the bridge; and all of defendants' expert witnesses, including defendant railway company's division engineer foreman, Litz, and the engineer operating the train, Douthit, testified that after the application of the emergency brakes the train could have been stopped within two hundred to three hundred and thirty-five feet. Plaintiff's expert witnesses fixed the distance from eighty to one hundred feet. At the time the emergency brakes were applied, the train, as this record discloses by a clear preponderance of the evidence, and as the jury found, as indicated by its answer to an interrogatory, was going twenty miles an hour which was the speed basis upon which the expert witnesses testified. The train being 283 feet long, as civil engineer Hornby testified, and the bridge 82½ feet, the lead coach went at least a distance of 365½ feet from the time the lead car reached the bridge until the train came to a stop; but if the jury believed Edward Donnelly's testimony that the engine came to a stop at the first electrification tower, the head coach ran about 503 feet from the western end of the bridge, before it came to a stop; and if the jury believed the testimony of defendants' witness McReynolds that the engine came to a stop about ninety feet from the eastern end of the bridge, the train went 82½ feet (the length of the bridge), plus 283 feet (the length of the train), plus 90 feet (the distance between the eastern end of the bridge and the place where the engine came to a stop), or 455½ feet from the western end of the bridge. So, even taking defendants' testimony as true, so far as it bears upon the position of the train when it came to a stop, and the distance within which a train going twenty miles an hour could have been stopped, as testified to by the defendants' witnesses, the emergency brakes were not applied until the lead coach had either gone beyond or had reached the eastern end of the bridge.

Moreover, the verdict of the jury being in plaintiff's favor, the evidence in this case must be appraised as though the court had directed a verdict in favor of the defendants on the basis that plaintiff had not proved primary, wilful and wanton negligence on the part of the defendants. In *Fielder v. Service Cab Co.*, 122 W. Va. 522, pt. 1, syl., 11 E. 2d 115, and *Boyce Admx., etc. v. Black,* 123 W. Va. 234, pt. syl., 15 S. E. 2d 588, this Court held : "Before directing a verdict in a defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence." Applying this rule, and taking as true the testimony of plaintiff's witnesses to the effect that after the application of the emergency brakes, the train, travelling at a speed of twenty miles an hour, could have been brought to a stop within eighty to one hundred feet, the train actually went many feet beyond the distance within which, after the application of the emergency brakes, it could have been brought to a stop. Viewed in this light, this evidence presents a dilemma which works against the defendants' theory of the case on the question of plaintiff's primary negligence, because the jury could have found as true either that the testimony of the Donnellys as to Neal's position and activities in the lead coach and the various places where Edward Donnelly and the train crew said the engine came to a stop, or as untrue the testimony of defendants' expert witnesses as to the distance within which the train could have been brought to a stop. It follows from the foregoing that the jury had the right to find that defendant Neal was wilfully and wantonly negligent in his duty as head brakeman of the defendant railway company's train, and, as the one evidently responsible to look after and protect the lives of all persons, though they be trespassers, who may venture on defendant railway company's right of way.

On the basis of defendants' Exhibits Nos. I and J, it is argued by counsel for defendants that the Donnellys from

their position in their home could not have seen the defendant Neal in front of the oncoming coach, leaning against the vestibule door. These two exhibits purport to be photographs of a front vestibule passenger car, other than the one involved in the instant case, which is, according to defendants' witness, George D. Minter, division car inspector for defendant railway company, "practically the same car construction as the one in question", with the camera located twenty-eight feet on each side of the test car, directed to the opening of the vestibule of the car at an angle of forty-seven degrees. The fact that the test car was "practically" of the same construction as the car in question here, does not indicate that the width of the vestibule opening and the depth of the platform from the vestibule door to the opening were the same as that of the car on which the Donnellys testified they saw Neal standing. In fact, Minter testified that the platform of the test car from the door to the inside of the vestibule was 39 inches, but neither he nor any other witness testified as to the depth of the platform of the lead coach here involved. In any event, this evidence is in conflict with the Donnellys' testimony, and presents simply a jury question and does not render the Donnellys' testimony incredible.

At this point it may be well to examine and consider decedent's status in relation to the defendant railway company at the time she entered defendant railway company's bridge and received her fatal injuries. This record discloses, as heretofore stated, that at all hours of the day and night, week in and week out, the bridge was used by men, women and children in going from the northerly side of the railroad to Route No. 52 on the southerly side thereof, and in returning the same way; but undoubtedly the use of the bridge by decedent was inherently dangerous. Immediately upon her entrance on the bridge, Mrs. Stokey placed herself in a position of imminent peril. Various responsible witnesses testified concerning the danger of using the bridge as a means of foot travel. In *Hall v. Monongahela West Penn Public Service Co.*, 128 W. Va. 547, pt. 1 syl., 37 S. E. 2d 471, a case in which the decedent Hall was

struck and killed on defendant railway company's bridge, this Court held: " 'One not in the employ of a railway company, using its tracks as a walk way over a portion thereof which pedestrians are accustomed to use for such purpose, but not at a public crossing, is at most a mere licensee, and such railway company owes to him no higher or other duty than it owes to a trespasser.' Pt. 1, syl., *Blagg, Admr. v. Baltimore & Ohio Railroad Co.*, 83 W. Va. 449. Such duty is no higher than not wantonly or wilfully to injure such pedestrian." The *Hall* case was followed by the recent case of *Payne v. Virginian Railway Co.,* 131 W. Va. 767, 51 S. E. 2d 514. If, as we have indicated, the defendant Neal, as the lead coach rounded the curve to a position where Mrs. Stokey was necessarily in sight, made, as the Donnellys testified, no effort to stop the train or slacken its speed, he and his employer, the defendant railway company, under the doctrine of *respondeat superior* were guilty of wanton and wilful negligence, and, if after actual discovery of decedent in her evident position of peril, the defendant railway company, through its head brakeman, failed to use reasonable care, to avert injury to plaintiff's decedent, and such failure resulted in her death, the defendants are guilty of actionable negligence. Section 479, Restatement of the Law of Torts; "Last Clear Chance—Some Further Observations", by Robert T. Donley, a member of the Monongalia County Bar, 49 W. Va. L. Q. 51.

That at the time decedent was struck, she was in a position of imminent peril clearly appears from this record. But could she, by the exercise of reasonable care, escape therefrom? After decedent was struck, her body was found three or four feet from the western abutment. When first seen by Neal and McReynolds, she was near the western end of the bridge, according to McReynolds six ties therefrom, hurrying to reach the western concrete abutment before the arrival of the train. Neal testified that she was on the southern guardrail about ten or twelve feet from the western end of the bridge; and McReynolds' testimony is to the effect that she was in the center of the

eastbound track, "walking facing the train. * * * She wasn't running, but she acted like she was in a hurry. * * * Well, she seemed like she was trying to get across the bridge." When witness first saw her, decedent was six ties from the western end of the bridge. Neal testified to the effect that when he first saw decedent, he knew and realized that she was in a place of danger, and, in answer to the inquiry: "And you knew that if you didn't slacken the speed of that train or stop it you were going to hit her?", he answered, "That is right."

Whether decedent could or could not have escaped from her perilous position undoubtedly is a jury question. This record discloses that decedent was trying, while very near the end of the bridge to get off the bridge and on the concrete abutment. This was her only reasonable avenue of escape. True, as defendants contend, when the train first came into view decedent was near the steel floor beam about $9\frac{1}{4}$ feet east of the concrete abutment, and perhaps she could have walked out on the steel floor beam, which is $12\frac{3}{4}$ inches wide at the top, a distance of about five feet and held to the steel gusset, connecting the floor beam with the southerly girder of the bridge; or she could have jumped to the rocky bed of the stream beneath the bridge, a distance of about six feet from the top of the ties to the place where her body was found. But decedent was a small woman, seventy-four years of age. The height involved may have been a "dizzy height" for her, unaccustomed as she was to walking on high and narrow beams, and a jump from a six-foot height was high indeed for a person of her advanced years. The time in which she could have decided what to do in the dire emergency in which she found herself, was too short to expect her to take any course other than the one she was pursuing at the time she was struck. That the experienced head brakeman Neal on former occasions had used the steel beam and held to the gusset to avoid a passing train, is not the test which should be put to this small and elderly decedent. The jury, we think, had the right to say that this decedent not only was in an imminent position of peril, but that she could

not have escaped therefrom by the exercise of reasonable care. So we simply have a case involving a decedent, who, though in the first instance may have been guilty of negligence in going on the bridge, notwithstanding the inhibitions given her by her daughter, and the inhibitory signs placed by the railway company at each end of the bridge, thus placing herself in imminent peril from which she could not extricate herself, and a defendant railway company, whose head brakeman, according to his own testimony, knew and realized that decedent was in a position of peril, and would be struck unless the train was stopped or its speed slackened, when, as the train rounded the curve in the cut, decedent first came into view.

But, of course, there can be no recovery here if, as the railway company contends, Neal by the use of the emergency cord proceeded to stop the train at the first opportunity presented and with all possible dispatch. It is contended that Neal made every possible effort to prevent injurying decedent, and that there was nothing he or the other members of the train crew could have done that they did not do in order to keep the train from striking decedent. It is said by Neal that he first saw decedent as the coach rounded the curve; that as quickly as possible he turned, opened the door, and pulled the emergency cord, a movement which he said took three seconds. If this train was going at the rate of twenty miles an hour, the head coach would have travelled almost ninety feet during that time. Likewise the railway company adduced evidence to the effect that after the application of the emergency brakes several seconds would be required for them to begin to take effect. There is some testimony for the defendants to the effect that some little time is required, after the emergency cord is pulled, for the air to escape from the line in order to permit the air from the reservoirs to apply to the brake pistons. But, on the other hand, there is evidence in this record to the effect that instantaneously upon the application of the emergency, the air will be released from the line. One witness for plaintiff, who evidently was well informed and referred to what was a

standard work on the subject, testified that immediately upon the application of the emergency, the air will leave the line at the rate of seven hundred feet a second. As the instant train was at most 283 feet long, under this latter evidence the air was released from the line after Neal applied the emergency brakes on the basis of 283/700 of a second, during which time the train would have travelled only about twelve feet.

Because this verdict is in plaintiff's favor, we must assume as true the testimony of plaintiff's expert witnesses to the effect that the train could have been brought to a stop within a distance of eighty to one hundred feet, after the application of the emergency brakes. With this distance in mind, it then becomes necessary for us to note what this record discloses as to the distance that Neal was from decedent at the time he first saw her. On cross-examination Neal testified that he was approximately 85 feet from Mrs. Stokey, when he first saw her. But further on cross-examination defendants' Exhibit A was shown to him, a photograph in which Neal was standing on the bridge in the position decedent occupied when he first saw her, he was asked: "Read over to the jury what that caption on the photograph says", and he answered, "It says, this picture 'Taken with camera between rails of eastbound track, 169 feet west of point of accident facing east. The man barely discernible on the track over the bridge indicates where the woman was when first seen by the brakeman riding the front of the lead coach of the train involved'." He was then asked: "How many feet is it?", to which he answered, "It says 169 feet there." The cross-examination proceeded:

"Q. You took the picture to show how far you were away when you saw her, didn't you?
"A. Yes, sir, but he asked me how far I thought I was away when I first saw her.
"Q. You all took the photographer up there and you stood on the bridge to show where Mrs. Stokey was?
"A. Yes, sir."

If decedent was negligent in the first instance in going on the bridge, thus placing herself in peril, her negligence had ceased before she was struck, while hurrying along as best her age would permit to reach a place of safety on the concrete abutment: she tried to escape from her peril, but could not do so in the face of the oncoming train. Neal testified that while the train travelled 169 feet, she had travelled only eight or ten feet. In answer to the inquiry: "Would you say that she had got to the end of the bridge when the train struck her", he answered, "I believe she had." He further testified that she possibly could have been at the end of the bridge when she was struck, if her body was found four to six feet from the concrete abutment. Witness testified that the front end of the coach hit Mrs. Stokey; and that he thought he heard a "thump", which sounded as if it was at the end of the bridge.

Of course, inasmuch as this case involves the question whether decedent's fatal injury was caused by wanton or wilful misconduct on the part of defendants, the defense of contributory negligence is immaterial, because the doctrine of contributory negligence is inapplicable where the defendant is guilty of wanton or wilful negligence. *Stone v. Rudolph,* 127 W. Va. 335, 32 S. E. 2d 742; *Boggess v. Chesapeake & O. R. Co.,* 37 W. Va. 297, 16 S. E. 525. But decedent's initial act in going on the bridge, whether negligent or not, is important in that it led to the inescapable position of peril in which she found herself as defendant railway company's eastbound train approached around the curve. This is indeed a case in which a decedent, whether negligent in the first instance, was in a position of peril from which she could not escape, and defendant railway company, through its agents, actually saw decedent in that position, knew of her peril, and realized that if the train was not stopped or its speed slackened decedent would be struck. In our opinion, the doctrine of last clear chance, as applicable in railroad cases, applies here, because Neal, having seen and realized decedent's predicament, by the exercise of reasonable care could have averted killing her. This record permits a factual finding by the

jury that at the time decedent was struck she was virtually at the end of the bridge, and required only a step to reach the concrete abutment. If she was travelling three miles on hour, as she hurried along, she would, according to a stipulation in the record, have gone 4.4 feet a second and in two seconds she could have gone 8.8 feet. If the lead coach, as Neal testified, was 169 feet from her when he first saw her, it would have required more than five and six-tenth seconds for the train to have reached the place where Neal testified he first saw her; and even if it took three seconds for Neal to apply the emergency brakes, there is evidence in this record that after the application, the brakes started to take effect almost immediately. Surely, if Neal had applied the emergency brakes at the time he said he did, the train would have slackened to some degree at least, which the Donnellys both testified it did not, before it reached the end of the bridge. A slackening which would have given decedent even a second of additional time to reach safety might have prevented the fatality, though the train could not have been stopped completely before it reached the place where decedent was struck. See *Prok, Admr. v. Norfolk & Western Railway Company*, 75 W. Va. 697, 699, 84 S. E. 568. In these circumstances we think it was for the jury to say, as it did, under the court's instruction A, which presented to the jury the question of the application of the doctrine of last clear chance, that when Neal first saw decedent in her position of peril and immediately knew and realized, as he testified he did, of the imminence of her danger, that there was a sufficient interval of time by slackening the speed of the train to permit decedent, as she endeavored to reach a place of safety, to succeed in her effort. That part of the instruction reads as follows:

"Accordingly the court instructs you that if you believe from a preponderance of the evidence that after plaintiff's decedent entered on said bridge she continued to be on the alert and to exercise reasonable care to discover the approach of the train and that after discovering the same she used reasonable care with the means avail-

able to avoid being struck and was not negligent in this particular, and if you further believe from a preponderance of the evidence that the brakeman on the rear end of the train saw the decedent on the bridge and realized that she was in a position of imminent danger and peril from which she could not extricate herself and avoid being struck by the train by the exercise of reasonable care upon her part, and that at the time the brakeman so saw the decedent on said bridge, in the aforesaid position of imminent danger and peril, he could have slackened the speed of the train or stopped it, by the exercise of reasonable care, and thereby avoided striking the decedent, and that he thereafter failed to exercise reasonable care to slacken the speed of the train or to stop it, with the applicances he had at hand, and that such failure to slacken the speed of said train or to stop it was the proximate cause of the accident, then your verdict should be for the plaintiff. But if you should believe from the evidence that the plaintiff's decedent was negligent in not being on the alert after she went on said bridge to cross it in discovering the approach of the train, or that after discovering it she did not use reasonable care with the means she had at hand to get out of the way to avoid being struck, then you should find for the defendant.

"If, however, you believe from the evidence that the brakeman on the rear of the train did not see the decedent in time to have prevented the accident or that after he did see her he used reasonable care with the means he had at hand to prevent the accident and it occurred nevertheless, then your verdict should be for the defendants."

This correctly instructs the jury on the doctrine of the last clear chance. Certainly it did not prejudice the defendants: in some respects it is more favorable to the defendants than to the plaintiff, at least in regard to submitting to the jury the questions whether decedent was negligent in failing to discover the approach of the train after she went on the bridge, and, after becoming aware

of the oncoming train, she did not use reasonable care to avoid being struck.

Error is assigned to the refusal of the court to give defendants' instructions Nos. 7 and 10. Instruction No. 7 would have told the jury that "if the jury believe that B. A. Neal could not have stopped the train after seeing plaintiff's decedent on the bridge before the train reached the point where she was on or near the track, you will find for the defendants." Defendants' instruction No. 10 would have instructed the jury that "if the jury believe that B. A. Neal could not have stopped the train after seeing plaintiff's decedent on the bridge before the train reached the point where she was on or near the track, you will find for the defendants." Both of these instructions ignore plaintiff's theory of the case that, in view of decedent's position near the west end of the bridge at the time she was struck, and the short distance she would be required to travel in order to reach the western concrete abutment, the defendants were guilty of wanton and wilful negligence, if defendants could have slackened the speed of the train in time for decedent to have extricated herself from her peril. *Skaff v. Dodd, et al.*, (W. Va.) 44 S. E. 2d 621.

Error is also assigned to the admission, over defendants' objection, of evidence that the bridge was used by miners employed by Koppers Coal Company in going to and from busses on State Route No. 52, when Mrs. Stokey did not use it for such purpose. *Evans v. Carter Coal Co.*, 121 W. Va. 493, 5 S. E. 2d 117, is cited in support of this assignment of error. The plaintiff in the *Evans* case was an employee of the defendant, Carter Coal Company, lived in a company house, and was wont to cross the coal company's railroad tracks for the purpose of obtaining water from a spring on the other side thereof. This Court simply held in that case that if plaintiff had an implied license to cross the coal company's railroad tracks for the purpose of obtaining water, it was beyond the scope of the license for plaintiff to climb to the top of one of a string of loaded railroad cars standing on one of the

tracks, for the purpose of repairing a radio aerial from his house to a tree beyond and above the tracks, in which case the plaintiff became "in legal effect, a trespasser"; and the Court there held that because the injury to the plaintiff therein was not shown to have been wilful, the judgment in plaintiff's favor should be reversed.

The instant case was tried, and properly so, upon the theory of the holdings of this Court in *Hall v. West Penn Public Service Co., supra,* and *Blagg, Admr. v. Baltimore & Ohio Railroad Co., supra,* in which cases the plaintiffs were not in the employ of the defendant railway companies, and were using the tracks as a walkway over a portion thereof, which pedestrians were accustomed to use for such purposes, but not at public crossings. In each of these cases this Court held that the plaintiff "is at most a mere licensee, and such railway company owes to him no higher or other duty than it owes to a trespasser", which is the duty not wantonly and wilfully to injure such pedestrian. The use of the defendant railway company's bridge in the instant case by the employees of the Koppers Coal Company is merely cumulative evidence tending to show that the bridge was customarily and generally used, as Mrs. Stokey was using it, by members of the public generally. As it is immaterial, in so far as it was defendants' duty not wantonly or wilfully to injure decedent, whether she be a mere licensee or a trespasser, the admission of the evidence in question clearly was not prejudicial.

And, finally, error is assigned to the admission in evidence, over objection, of the testimony of James Williams as to the test Williams had witnessed of the distance in which a train could be stopped near Matoaka in Mercer County. This testimony should not have been admitted but, in our opinion, its admission did not constitute prejudicial error, for the reason that the witness' estimate as to the distance in which the train, going twenty miles an hour, in the instant case could have been stopped was not predicated on that test. In answer to the inquiry of defendants' counsel on cross-examination: "And your

testimony today is on your experience prior to 1935?", the witness answered, "It certainly is." Moreover, the witness testified that the train involved in the test had the same weight and was composed of practically the same make-up as the instant train, but in that case the test was made on a slight downgrade, with the train purporting to the running twenty-five miles an hour, in which case the witness testified that three tests were made, on the first of which the train came to a stop at 120 feet, after the brakeman had opened the angle cock; 130 feet on the second test; and on the third test still farther. As the distance in which the train on the test was brought to a stop is from twenty to more than thirty feet farther than the witness testified the instant train could have been brought to a stop, the jury surely would have taken these things into consideration, and would have regarded the evidence as to the test as having little evidentiary weight, especially in view of the witness' categorical statement that his testimony was based upon his experience as a locomotive engineer.

In our opinion, this case, being without prejudicial error, the judgment therein should be affirmed.

*Affirmed.*