# CHARLESTON.

BANK OF WHITE SULPHUR SPRINGS *v.* G. H. LYNCH.

Submitted March 13, 1923.    Decided March 20, 1923.

1. PRINCIPAL AND AGENT—*Principal Liable for Contract of Agent Within Scope of Authority.*

   A principal is liable for the contract of his agent made within the scope of his Authority. (p. 386).

2. SAME—*Agent Held to Act for Principal Alone in Negotiating. Purchase of Horses.*

   Where a principal sends an agent to purchase a certain team of horses from the owner, and the latter agrees to sell the horses at a stipulated price, subject, however, to confirmation by the beneficiary of a trust lien upon the horses, who being interviewed by the agent agrees to the sale upon condition that the notes representing the purchase price be turned over to him in payment of his lien thereon; whereupon the agent with consent of the owner draws the notes payable to the trust lienor, which are taken by the agent to his principal who signs and delivers the same knowing why the notes are so payable, the agent is not acting in a dual capacity, but represents the purchaser alone. (p. 383).

3.  SAME—*Question of Agency Arising from Undisputed Facts for
    the Court.*

    ، Where the facts are undisputed, the question of agency
    arising therefrom should be determined by the court, and
    not submitted to the jury.   (p. 386).

4.  TRIAL—*Not Error to Direct Verdict for Party in Whose Favor
    Evidence Plainly and Decidedly Preponderates; Motion for
    Directed Verdict Should be Considered by Court as a Motion
    to set Aside Verdict Returned for Opposite Party.*

    Where the evidence plainly and decidedly preponderates
    in favor of a party it is not error to instruct the jury to
    return a verdict for him.   On a motion for a directed verdict
    the court should be guided by what its action would be if
    a verdict should be returned for the opposite party and a
    motion made to set aside the verdict.   (p. 387).

Error to Circuit Court, Greenbrier County. .

Action by the Bank of White Sulphur Springs against
G. H. Lynch and others.   Judgment for plaintiff, and named
defendant brings error.

*Affirmed.*

*J. S. McWhorter*, for plaintiff in error. ، .
*Chas S. Dice*, for defendant in error.

LIVELY, JUDGE:

From a judgment for $214.40 rendered on the 20th of May,
1922, upon a directed verdict, defendant prosecutes this writ
of error.

The error relied upon for reversal is that the court, over
defendant's objection, directed the jury to find a verdict for
plaintiff.   Defendant's brief and argument are based upon
this assignment.   The suit originated in the court of a justice
of the peace, on two negotiable notes each for the sum of $100,
the first dated May 18, 1921, and the second dated May 15,
1921, payable to plaintiff, signed by defendant and endorsed
by J. C. Myers; the first note becoming due on September 15,
1921, and the second on October 15, 1921, both of which notes
were protested for non-payment.   A jury in the justice's
court returned a verdict in favor of plaintiff, and an appeal
to the circuit court was granted where the judgment com-

plained of was rendered. The defense is want of consideration and failure of consideration.

Defendant was engaged in fulfilling a contract with the Morgan Lumber Company for hauling certain logs and manufacturing them into lumber on the north fork of Anthony's Creek in Greenbrier County.    John Kessinger was the manager of the Morgan Lumber Company, and it became apparent to both Lynch and Kessinger that Lynch was in need of a team of horses in carrying out his lumber contract. Kessinger suggested that J. C. Myers, who was in the lumber business in that vicinity and for whom he had formerly worked, had a team, known as the Myers team, which would be suitable for the work required, and Lynch sent Kessinger to see if the team could be purchased. The team at that time was at Wade's crossing and was in the custody of Bowling-Harden Company.    Lynch went to look at the team, and they were shown to him by John Andy Gum, and he concluded that they were suitable for his purpose, and authorized Kessinger to purchase them.   Kessinger then went to Myers to see if the team could be purchased, and told Myers that Lynch would pay $500 for them in deferred payments; Myers informed Kessinger that the Bank of White Sulphur, the plaintiff, held a deed of trust lien on the horses and that he could not dispose of them without the assent of the beneficiary in the trust deed, and directed him to go to the bank and get its consent to the sale.   Kessinger then proceeded to see the cashier of the Bank, Hines, who agreed to release the lien upon the team if the money therefor, the $500, was paid to the bank, and directed that the notes be made payable to the bank.   Kessinger then returned to Myers where the sale was concluded, and the notes were drawn up, which notes he then took to Lynch, who signed the same. It appears that Kessinger told Lynch when the notes were signed that he would personally bring the horses down from Wade's crossing on the following Monday.    The notes were signed about the 7th or 8th of May, and post dated the 15th and 18th of that month in order that Lynch could meet them after his pay days which seem to have been about the 10th of each month.   Kessinger took the notes and delivered them to the bank and on the following Monday went to Wade's crossing

where he found that the Bowling-Harden Company claimed a lien on the horses for a feed bill, and would not release them until the bill was paid. This he promptly reported to Lynch. It appears that this feed bill was released about two weeks thereafter according to Kessinger (Lynch says about the first of June), and a notice to that effect delivered to Lynch. Lynch complained to Kessinger that he needed the team, and testified that he told Kessinger a short time before the horses were released, that unless he could get them promptly he would not need them, and would make other arrangements; and requested Kessinger to go to the bank and get his notes. Kessinger informed Lynch that he himself should go to see about his notes. It appears that no complaint was made by Lynch about the delivery of the horses to either Myers or to the bank until on the 25th of July following he wrote a letter to the bank to the effect that he couldn't get possession of the team within a reasonable time and that he didn't think it reasonable to hold him to the deal. It appears, however, that according to the terms of the notes one had become due about the 15th of June and the other on or about the 15th of July, and on the 25th of July Lynch wrote a letter to the bank in which he says: "I will be down the 10 of next month and pay you. Hope this will be satisfactory with you." It does not appear what became of the horses. Lynch says that they were never delivered to him, and hence he ought not to pay the notes. On the trial the bank produced the protested notes and the two letters of Lynch above referred to, and rested its case. All of the other witnesses, Lynch, the defendant, Kessinger, Fred Wade, a partner of Lynch, and W. S. Wade, his father-in-law, were introduced by defendant, by whom the facts above detailed were proven. Lynch, in his evidence, states (and that position is taken by his counsel), that Kessinger was acting for the bank in making this sale. He assumed that he was dealing with the bank in the purchase of these horses and that Kessinger was the agent of the bank for that purpose and that the bank was bound by the statements made by Kessinger. Kessinger stated in his evidence, in answer to a question as to whom he represented, that he supposed he was representing both parties. This was a conclusion of the witness. It is

well established that in receiving testimony of an alleged agent to prove or disprove his agency the rule that a witness must testify to facts and not to conclusions is applicable, and it is not competent for an agent to give his opinion or state his conclusions as to the fact of the agency. He may state the facts and circumstances concerning the various transactions between himself and his alleged principal, leaving it to the court and jury to determine under the facts disclosed whether or not he was such agent. 2 Corpus Juris. p. 935, sec. 961. In response to a question by the court, Kessinger said that when he turned the notes over to the bank they were accepted in payment of the lien which it held against the team. It appears that the bank never had any possession or control over the team, simply had a lien thereon to secure the debt against the owner, Myers.

The controlling question in this case is the agency of Kessinger in this transaction; whether he represented Lynch or Myers or the bank. The conclusion of Lynch that Kessinger represented the bank seems to us to be entirely erroneous and not justified by the facts which he brought out himself. It clearly appears from the evidence that Kessinger was acting under the direction of Lynch to secure for him a suitable team for the advancement of the work in which he was engaged. He received no compensation from Lynch, but was acting in a friendly way in order to promote the fulfillment of the contract which he had with Kessinger's company. Kessinger received no pay or consideration whatever from either Myers or the bank. The facts warrant the conclusion that in all these transactions Kessinger was the agent of Lynch, and Lynch is bound by what he did. Lynch had inspected the horses before he concluded to buy and had instructed Kessinger to purchase them for him. He confirmed the purchase by signing the notes with full information as to the facts. Questions of law in actions relating to principal and agent, as in other civil actions, are for the determination of the court and it is error to submit them to the jury where the facts are uncontroverted. We think the lower court properly concluded from the facts detailed that Kessinger was the agent of Lynch and not of the other parties. Therefore, the statement made to Lynch by Kessinger at the time

the notes were signed that he, Kessinger, would personally bring down the horses on the following Monday would not be binding upon either Myers or the bank. The evidence of Kessinger is silent as to when he agreed with Myers that the team should be delivered. The inference is that he, himself, was to go to Wade's crossing and take possession. Delivery was not necessary to the completion of the sale by execution and delivery of the notes. The property then belonged to the buyer, the title having passed. If no time had been agreed upon as to the possession of the team, a reasonable time would be inferred, and as above stated, it seems that Lynch made no complaint about the prompt delivery of the team except to Kessinger. He seemed to think it was Kessinger's duty to make the delivery. Bowling-Harden Company released the team from its claim for the feed bill, a short time thereafter, and a written notification to that effect was conveyed by Kessinger to Lynch, and he took no steps toward procuring the team and made no complaint to the bank until the 25th of August following, after two of his notes had become due, and which he had previously, on the 25th of July, written to it that he would pay. Lynch could have obtained possession at any time by paying the feed bill which would have been an off-set against his purchase money notes.

Under these facts if there had been a verdict for defendant it would have been the duty of the court to set it aside. The evidence plainly and decidedly preponderated in favor of the plaintiff. On a motion for a directed verdict the court should be guided by what its action would be if a verdict was returned for the opposite party, and a motion made to set aside that verdict. *White* v. *Hoster Brewing Co.,* 51 W. Va. 259. In discussing this salutary rule Judge Dent in the last cited case aptly said: "Shall the circuit court in a plain case be compelled to sit still and permit a jury to bring in a verdict contrary to the plain and decided preponderance of the evidence, and then set it aside and be compelled to repeat the farce of a trial? Or shall the circuit court follow the settled practice of the courts of the United States and direct a verdict against the party in whose favor the evidence does not warrant a verdict?" He quotes from *Merchants National Bank* v. *State National Bank,* 10 Wall. 604, as follows: "The

practice is a wise one. It saves time and costs; it gives the certainty of applied science to the results of judicial investigation; it draws clearly the line which separates the province of the judge and jury and fixes where it belongs the responsibility which should be assumed by the court.''

We cannot see that there was any substantial conflict over any fact material to the issue which should have been submitted to the jury. It follows from what we have said that the judgment is affirmed.

*Affirmed.*