J. F. REED, *Sheriff, Adm'r., etc.*

*v.*

C. G. JANUTOLO, *et al., etc.*

(No. 9825)

Submitted September 4, 1946.    Decided October 1, 1946.

564

*Love* and *Love,* for plaintiffs in error.

*H. E. Dillon, Jr.* and *Charles E. Mahan,* for defendant in error.

RILEY, JUDGE:

J. F. Reed, Sheriff, Administrator of the Estate of Harry Luther Plumb, deceased, brought this action in trespass on the case in the Circuit Court of Fayette County against C. G. Janutolo and S. C. Cappellari, trading and doing business as Janutolo & Company, to recover damages for the alleged wrongful death of Harry Luther Plumb. This writ of error is prosecuted to a judgment in the amount of four thousand dollars based upon a jury verdict rendered against the defendants.

In *Fielder, Admx. v. Service Cab Company,* 122 W. Va. 523, 11 S. E. 2d 115, and *Wilson v. Cooperative Transit Company,* 126 W. Va. 943, 945, 30 S. E. 2d 749, this

Court held, as stated in point one, syllabus of the *Fielder* case: "Before directing a verdict in a defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence." And as stated in the body of the opinion of the last-mentioned case: "This rule *ex necessitate* should guide us in stating the facts and inferences upon which this opinion is based."

Decedent, Harry Luther Plumb, age thirteen, was killed on February 22, 1945, by being crushed under a large rock, variously testified in the record as weighing one and a half to six tons, with approximate dimensions of sixteen feet in circumference and four feet in thickness, on a tract of land of 1700 acres, owned by Marion Ciminari.

By an agreement of lease, dated May 11, 1943, Ciminari demised to the defendants, C. G. Janutolo and S. C. Cappellari " * * * the exclusive right to mine all the remaining coal in the Sewell Seam" in a 1700-acre tract " * * * by what is known as 'strip mining', the latter as defined by Chapter 84, of the Acts of the Regular Session of the 1939 West Virginia Legislature." Under this agreement defendants had the right to use so much of the surface in connection with the strip mining of coal, as might be necessary for roads, tramways, ditching, etc., and were obligated to "faithfully and fully" observe and comply with "all the requirements of the statutes of West Virginia, or any other law, now existing, or as hereafter amended or enacted, including the Acts of the 1939 West Virginia Legislature, applying to and governing such method of mining." The lease provided for no ground rental or minimum royalty. The only monetary consideration thereunder was lessees' agreement that they would pay Ciminari twenty-five cents a ton for each ton of two thousand pounds of coal strip mined. The lease further provided that, "If at any time, due either to poor grade of coal, faulty seam, unfavor-

able market, or any other cause not mentioned herein which would make it unprofitable to operate under this lease, the lessees shall have the right to cease operations and terminate this lease, without any advance notice to the lessor, and to remove all of their equipment from said premises." Under this agreement the defendants, who had long experience as road contractors, entered on the premises leased with a part of the equipment which they were wont to use in the construction of roads, and proceeded to remove the coal by strip mining.

At the time decedent was killed, he was temporarily living with his father, brothers, and cousins at the home of his uncle and aunt, Willie Ester and Carrie Plumb, at Rock Lick in Fayette County, in a house situated upon said 1700-acre tract, under a lease from Ciminari, which antedated the lease to defendants. This house was only partially inclosed by a fence. Decedent, together with his brothers and cousins, was accustomed to go on the land leased to defendants in going to and from a public school located on a hill above the house in which they were dwelling. It was the custom of the children to play on the hillside in the late afternoon and early evening.

Some time between the middle of January and the first of February, defendants made a road with a bulldozer to a point on the hillside about one hundred and seventy-five feet above the Plumb house, for the purpose of moving a shovel powered by gasoline to make a test hole to determine whether the coal at that point was of sufficient quality and the seam thereof of sufficient thickness to justify strip mining operations there; and in the presence of Ciminari an excavation about eighteen feet long was made into the hillside, where, according to defendants' witnesses, a seam of soft coal twenty-four to thirty inches in thickness and unsuitable for strip mining was encountered. This coal was capped by a heavy stratum of soft sandstone rock, the fall of a part of which caused decedent's death. From photographs introduced in evidence and taken after decedent was killed, it appears that a part of the rock which had not fallen contained

cracks. Janutolo himself testified that the sandstone and the coal thereunder were soft; that immediately after the test was made the rock, in his opinion, was "solid"; but he testified that from his long experience as a road contractor, soft sandstone rock, such as was involved in the instant case, during wet or intermittently freezing and thawing weather, would sometimes fall, and that from the time that the test was made until decedent's death the weather was at times cold, accompanied by snow and freezing and thawing temperatures. The record discloses that it was raining when decedent's body was removed.

On cross-examination, one of plaintiff's witnesses, P. W. Cobb, Jr., age fifteen, testified to the effect that on the afternoon of the day on which decedent was killed, he heard decedent tell Leonard Darby "something" about knowing a good place to dig a cave "where the steam shovel made it", and in answer to the inquiry, "Do you know what Harry was doing up on the hillside on the day he was killed", he answered, "He just said there was a hole or something that the steam shovel had made up there and he was going to see what it was * * *". Later in the early evening, decedent and his brothers and cousins were playing "hide and seek" in the vicinity of the test hole. While one of the boys named Jerry Plumb covered his eyes, the other boys ran to hide, and decedent was seen running toward the test hole. Shortly thereafter one of the boys who was hiding behind some garages down the hill from the test hole, heard Jerry crying, and running up to him he was told that "Lulu", meaning decedent, was dead. There he saw decedent under a large rock at the test hole with only one hand and the upper part of his head protruding. Upon the alarm being given, decedent's father and others living in the vicinity proceeded to the place of the fatality. At first a hoe was used, then a hand shovel was brought, and finally two of the boys brought a pick. Shortly thereafter, the superintendent of a nearby mining operation came to the scene and, being the one with the most experience, proceeded to supervise the operation of removing dece-

dent's body from beneath the rock. In order that the boy's body should not be disfigured by a further fall or slip of rock, he suggested that the rock be supported by posts, which was done with posts which some one unknown to the witness handed to him. A trench was dug under the rock beside and under decedent's body, and the body was moved into the trench, from which it was then removed. Witnesses testified for the defendants that decedent's body was lying so that his feet were directly toward the hill; but when the body was removed one person took hold of decedent's arm and another reached back and grasped decedent's legs and in this way the body was removed. The witness who held decedent's legs testified that the body was in a cramped position.

Defendants contend that between the time the test was made and the time of decedent's death, the coal was removed from beneath the rock "by Harry Luther Plumb, or other persons, without the knowledge or consent of the defendants." However, there is no evidence in this record to the effect that decedent or any member of the Plumb family had removed any coal from under the rock. Decedent's uncle, Willie Ester Plumb, testified that he made an examination of the coal behind the rock on the morning following decedent's death, and saw in the face of the coal prints of the teeth of the power shovel. This witness testified further that he did not see any pick marks there.

Witnesses testified variously as to whether defendants had placed "No Trespass" signs on the premises leased to them. There is evidence to the effect that such signs had been posted at several places on the Ciminari land, but the record does not clearly show whether such signs were placed there before or after decedent was killed. However, it clearly appears that no signs of warning were placed at or near the test hole. Defendants introduced evidence to the effect that Janutolo himself, as well as some of his employees acting under his instructions, had at times chased children away from the scene of the actual stripping operations, which at the time de-

cedent was killed were being conducted along the hillside about two hundred yards away from the test hole.

Basing their position to a large extent upon the testimony of Janutolo, defendants deny that either they or their employees knew that children were wont to play at or in the immediate vicinity of the test hole. However, the record before us is such that, applying the rule in the case of *Fielder, Admx. v. Service Cab Company,* *supra,* and *Wilson v. Cooperative Transit Company,* *supra,* it must be said that some of defendants' employees knew the custom of children to play over the whole hillside above the Plumb house, including the place where actual strip mining was being conducted, and the test hole was located. Plaintiff's witness, Grattan C. Rider, who, as defendants' bulldozer operator, had constructed the road to the place where the test hole was made, testified that after the test hole was made on the "hillside" and before decedent was killed, he saw children "playing on the hillside around there". He further testified that the place where he was operating the bulldozer was within sight of the test hole; and D. H. Law, defendants' steam shovel operator, who had made the test hole for defendants, testified that when school was out he noticed children go by the test hole, and on the evening decedent was killed, he saw and heard about "half a dozen" children playing near the test hole.

Defendants assert five points in furtherance of their writ of error: (1) the premises at the place where the test hole was made were surrendered to the landlord, Marion Ciminari, and the responsibility for the condition of the premises there became his; (2) plaintiff's decedent was a trespasser to whom defendants owed no duty other than not to wantonly or wilfully injure him; (3) plaintiff's decedent's death was not in the light of human experience likely to happen, so that their failure to anticipate it would constitute actionable negligence; (4) plaintiff's decedent mined coal from under the rock and placed himself thereunder, and thereby assumed the risk of injury or death, for which there can be no re-

covery as a matter of law; and (5) the court erred in admitting the evidence of previous trespasses by children at the point where strip mining was being done at the time of the fatality, and at the place where the test hole was made, it not being shown that a dangerous instrumentality or concealed danger existed on the premises. For convenience these points will be considered seriatim.

Defendants' first position, in our opinion, under the terms of the Ciminari lease to defendants is untenable. The lease provides for its termination when due either to poor quality, faulty seams, unfavorable market, or any other cause not mentioned therein would make it unprofitable to operate under the lease. The determination of defendants after the test hole was made not to strip mine coal at the place where the test was made, though Ciminari was consulted concerning such decision, is not an abandonment of the lease as contemplated by the terms thereof. On the contrary, defendants did not abandon the lease, but moved their machinery about two hundred yards away, where they proceeded to and at the time decedent was killed were actually strip mining.

Plaintiff's decedent, in our opinion, was not, as suggested in defendants' second point, a trespasser to whom defendants owed no duty other than not to wantonly or wilfully injure him. Unlike the status of the infants in the cases of *White v. Kanawha City Co.,* 127 W. Va. 566, 34 S. E. 2d 17; *Richards v. Hope Construction & Refining Co.,* 121 W. Va. 650, 5 S. E. 2d 810; *Martino v. Rotondi,* 91 W. Va. 482, 113 S. E. 760, who were upon the property of another without license or invitation, and therefore were trespassers, the Plumb boy was killed by the falling rock at the point on the Ciminari land, where, according to the uncontradicted evidence in this case, including that of two of defendants' employees, he was accustomed to play with his companions. The Ciminari lease to the Plumb family preceded in point of time the strip mining lease to defendants. In view of the fact

that the Plumb dwelling house was only partially inclosed by a fence, and that it was convenient to go, as the children did, around the hill past the test hole to and from school, taken in connection with the common useage and custom of these children to play at and in the vicinity of the test hole, we are prompted to hold that the Plumb boy had the right to play on and use the hillside at or near the test hole, as much as if such right were extended under the express terms of the Ciminari-Plumb lease. He, therefore, was not a trespasser, and the defendants, not having, as we have suggested, abandoned the lease, owed to decedent the duty to use reasonable care not to injure him.

Under defendants' third point to the effect that they are not guilty of negligence because they were not bound to anticipate that decedent might be killed or injured as a result of the condition in which defendants left the test hole, *Cooper v. Prichard Motor Co.*, 128 W. Va. 312, 36 S. E. 2d 405, is cited. The *Cooper* case involves injuries to an invitee alleged to have been caused by a fall on the floor of an automobile show room at a place where there was an incline in the floor. In that case there was no proof that the room was insufficiently lighted or that there was any foreign or dangerous substance thereon which caused plaintiff to fall, and there was no evidence that any other person had ever fallen there during a period of about fourteen years. For these reasons this Court held that plaintiff therein could not recover. The record in the instant case, however, is such that, in our opinion, the jury could find, as it evidently did, that the excavation as left by defendants after the completion of the test hole created a dangerous condition, and that defendants should have anticipated that the decedent, or his companions, in play would be very apt to suffer injury or death if they played at or under the rock. Janutolo testified that he had had a wide experience in the use of machinery such as was used in making the test hole in the construction of public roads. His testimony is to the effect that the rock was a soft, or medium hard, sandstone, which, according to the testimony

of his power shovel operator, could have been cut by the shovel without the aid of blasting. Janutolo testified that sometimes in wet and intermittently freezing and thawing weather, rock of the character which fell upon decedent, would sometimes fall. The record shows that the rock in the instant case did fall on February 22, and that when decedent's body was being removed, it was raining so hard that it was necessary to dig a trench to draw the water away from the place where decedent was pinned under the rock; and further the record discloses that Janutolo, as well as the operator of his steam shovel, observed, as indicated by photographs introduced on behalf of the defendants, that there were seams or cracks in the stratum of the rock which did not fall.

We cannot hold, as suggested by defendants in their fourth point, that decedent assumed the risk of injury or death either by mining coal under the rock or placing himself thereunder. The record is absolutely devoid of any evidence to the effect that decedent, or any member of the Plumb families, had removed coal from beneath the rock, and the jury, notwithstanding the evidence introduced on behalf of defendants to the effect that the bucket of the power shovel and the construction of the boom of the shovel were such that there could be no excavation by a normal movement of the shovel of any part of the coal, had the right to believe the testimony of Willie Ester Plumb, decedent's uncle, to the effect that upon making an examination of the coal behind the rock on the morning following decedent's death, he saw the prints of the teeth of a power shovel in the face of the coal, and did not see any pick marks there.

Decedent was not quite fourteen years of age, and was unskilled in the art of excavation of earth, the construction of roads and strip mining operations, which, under Chapter 84, Section 1, Acts West Virginia Legislature, 1939 (the Strip Mining Statute) the Legislature found " * * * it to be a fact that the mining of coal by uncovering therefrom the surface soil, commonly called 'strip mining', * * * creates dangerous hazards in life and property * * *." This finding of fact by the Legis-

lature, of course, is not decisive of this case, but it is worthy of consideration by this Court in determining whether an excavation such as is involved here is a dangerous instrumentality. In view of the facts that there were cracks in the stratum of rock, part of which fell upon decedent, that three parts of the rock stratum which fell were at one time a single rock, that Janutolo testified to the effect that rock of the character which caused decedent's death, would sometimes fall, especially in wet weather, that the weather was rainy and wet at the time decedent's body was removed, it was for the jury to determine whether the test hole as left by defendants created a dangerous condition. Though this Court has through the years refused to follow the doctrine of the turntable cases, and the attractive nuisance doctrine generally has not been applied in this jurisdiction, this Court in *Rine v. Morris,* 99 W. Va. 52, 127 S. E. 908, has applied what at least is tantamount to the attractive nuisance doctrine where an instrumentality dangerous to children was in a place where the injured child had a right to be. In that case the defendant left a road scraper on the side of a public road sixty feet from plaintiff's home with certain parts of its machinery in an insecure and dangerous position. The Court in point 2 of the syllabus held: "One leaving an instrumentality dangerous to children at a place where they have a right to be, is charged with notice of its attraction to them. It is his duty to use ordinary care to prevent injury to a child thereby." In the instant case the excavation at and *near which decedent and his* companions were accustomed to play was located on the Ciminari land at a place where, as in the *Rine* case, plaintiff's decedent had a right to be. Many cases involving excavations claimed to be attractive nuisances are collated in 36 A. L. R. 164-167, inclusive, 189-190; 39 A. L. R. 487, 489; 45 A. L. R. 990; 53 A. L. R. 1453; 19 L. R. A. (N. S.) 1152-1154, inclusive. In *Perry v. Tonopah Mining Co.,* 13 F. 2d 865, the United States District Court for the District of Nevada held that apart from the state statute imposing a duty on mine owners to safeguard open mining excavations which had been abandoned, the owner

having knowledge that children resorted to the premises to play, was bound to protect a child of tender years playing there from the danger of falling down a deep, abandoned slope. The distinguishing features of the instant case from those cases involving excavations as attractive nuisances in those jurisdictions where the doctrine prevails and the West Virginia cases which deny liability on the ground that the doctrine does not prevail in this jurisdiction, are clear. Here decedent was not a trespasser: he was killed at a place where he had a right to be, the defendants knew, or at least should have known of the custom of children to play at and in the vicinity of the excavation, and the unequal knowledge as to the inherent danger of the excavation to playing children due to defendants' wide experience as road contractors, their knowledge of the character of the soft sandstone involved, and their knowledge, as shown by Janutolo's testimony, that such stone would sometimes fall during intermittently freezing and thawing weather, coupled with the fact that it was raining when decedent's body was removed from beneath the rock, compared with decedent's lack of knowledge due both to his immature years and his entire lack of experience, constitute such distinguishing features from the cases in which this Court and other courts have denied liability, that we are prompted to hold that the question of defendants' liability in the instant case is one for jury determination.

Under their fifth point of argument defendants say that the trial court erred in admitting the evidence of "previous trespasses by children" at the point where strip mining was being done at the time of the accident and at the place where the cut was made. We have already addressed ourselves to this point. At the time decedent was killed, as heretofore suggested, he was not engaged in a trespass: he was at a place on the Ciminari premises where he and other members of his family were entitled to be. The uncontradicted testimony of Grattan C. Rider, defendants' bulldozer operator, and D. H. Law, the operator of defendants' power shovel, to the

effect that prior to decedent's death and after the test hole was made, they saw boys playing at or near the test hole, was admitted into evidence on direct examination by plaintiff's counsel without any objection on defendants' part. In view of this evidence, the jury had a right to say that these employees had actual knowledge of the custom of the children to play at or near the test hole, which knowledge is imputed to defendants.

The foregoing disposes of defendants' assignment of error as to Court's ruling on the instructions. Defendants' motion to set aside the verdict and award them a new trial was accompanied by the submission of evidence claimed to bear on after-discovered facts. However, defendants did not show due diligence such as to warrant a new trial on such basis.

From this record we are of opinion that the action was fairly tried without any prejudicial error appearing in the record, and that the question presented was one for the jury.

The judgment of the trial court is affirmed.

*Affirmed.*