BELLE HAMMERSMITH, *Admx. Etc.*

*v.*

WAYNE M. BUSSEY, *et al.*

(No. 10310)

Submitted September 12, 1951. Decided November 27, 1951.

438

Fox, President, and Given, Judge, dissenting.

*Stathers & Cantrall, John R. Morris,* for plaintiff in error.

*Johnson & Johnson, William G. Johnson, Charles B. Johnson,* for defendants in error.

Riley, Judge:

Belle Hammersmith, Administratrix of the estate of Louis Hammersmith, deceased, instituted this action in the Circuit Court of Harrison County to recover damages for wrongful death. A verdict at the direction of the court having been returned in favor of defendants, Wayne M. Bussey and Lever Brothers Company, a corporation, plaintiff moved that the same be set aside and a new trial awarded, which motion was later overruled, and judgment entered on the verdict. To this judgment the plaintiff prosecutes this writ of error.

The declaration, as amended, charges, among other things, that on or about the 29th day of September, 1948, while plaintiff's decedent was exercising due care and caution for his own safety, Lever Brothers Company, a corporation, by its servant Bussey, and the said Bussey carelessly, unlawfully, negligently, recklessly and improperly drove and operated a certain 1948 Plymouth Coach on a public highway, known as State Route No. 73, near its intersection with Corbin Branch road, in Harrison County, and that by and through such action struck and fatally injured plaintiff's decedent, who was then lawfully on and walking upon and along said highway.

Decedent was killed about one thirty a. m., on September 29, 1948, on State Route No. 73 at a point between

Boothsville to the north and Bridgeport to the south, a short distance from its junction with Corbin Branch road. Immediately prior to the time that plaintiff's decedent was killed, he and his son were flagging defendants' Plymouth automobile for help, decedent having a short time before ditched his own automobile, a DeSoto coach, at or near a culvert in a dip in Route No. 73, a short distance south of the intersection with Corbin Branch road. The Plymouth automobile was being driven south in the direction of Bridgeport by defendant Wayne M. Bussey, who, together with the other occupants of the automobile, Peter Faini and Ralph Calabrese, was employed as a salesman for defendant, Lever Brothers Company, and was returning from a sales meeting held by the corporate defendant in the City of Pittsburgh, Pennsylvania.

Corbin Branch road intersects State Route No. 73 from the northeast at a sharp angle, adjoining the eastern edge thereof for a distance of approximately eighty-five feet. Beginning at a point on State Route No. 73 about two hundred sixty-five feet to the north of the northernmost part of the intersection of Corbin Branch road the highway is practically level. A few feet to the south the grade begins to drop and continues to do so for a distance to and beyond the point where decedent was killed. Seventy-five feet south of the beginning point, just referred to, the highway bears to the right on a curvature of eleven degrees for a distance of one hundred fifty feet to the point of tangent, and from the latter continues straightaway to and beyond the place where decedent was killed. Ninety-nine feet south of the point of tangent is a culvert with cement headwalls.

From the testimony of defendants' witness, Paul Allen Hornor, a civil engineer, who prepared a map covering a distance along State Route No. 73 of slightly more than three hundred feet on each side of the culvert, drawn to scale of twenty feet to an inch, and from a perusal of the map itself, it appears that for a distance of approximately four hundred twenty feet north of the culvert State Route No. 73 at a station designated on the map as "0+00",

where the elevation is arbitrarily set at 124.1 feet, the elevation of the road drops at stations "0+50"; "1+00"; "1+50"; "2+00"; "2+50"; "3+00"; "3+50"; "4+00"; "4+50"; and "5+00", to the respective elevations of 123.24; 121.66; 119.20; 114.41; 109.86; 106.02; 102.73; 100.77; 99.41 and 97.77 feet. The last-mentioned station, "5+00" is about seventy-six feet south of the culvert ("4+24"), so that it can be readily seen that from station "0+00" to the culvert the drop in elevation is slightly more than twenty-three feet. The sharpest drop in elevation occurs between stations "1+50" to "2+50", being 9.34 feet in one hundred feet, or a grade of more than nine per cent.

Hornor testified that, "Just before you hit the curve [traveling toward Bridgeport], the road starts to drop down and as you go into the curve it drops off rapidly, finally levelling off about seventy-five feet before you come to the culvert." This witness testified that the road has some superelevation or bank in it around the curve and on the straightaway it is slightly crowned "draining to both sides"; that at the intersection of Corbin Branch road with State Route No. 73, "The road is probably crowned a little higher in the center than on either side. You are practically out of the curve and because of the intersection it had to drop off to fit into it properly." From a point forty feet north of the point of curve, the vision of the road at the culvert is blocked by the bank on the right. The difference in elevation between the last two mentioned points, Hornor testified, is nineteen feet. At a point opposite the middle of the barn, shown on Hornor's map as located east of State Route No. 73 and north of the Corbin Branch road, that is, six feet south of the point of curve, Bussey for the first time had a vision of the road at the culvert, and from the map it appears that from this point to the culvert the distance is two hundred forty-three feet.

After Hammersmith's DeSoto had gone into the ditch at or near the culvert, the Hammersmiths, according to decedent's son Joseph, hearing an automobile approach-

ing from the north, started to walk north in the east lane of State Route No. 73 for the purpose of flagging it, in order to obtain help from the occupants thereof. This witness testified that he and his father were in the middle of the east lane at a point twenty feet south of the culvert and twenty-two feet north of the ditched DeSoto, when the Bussey automobile, driven in a southerly direction in the west lane, came into view, at which time they began to wave their arms. This witness testified further that the Plymouth automobile was then being driven at an estimated speed of fifty-five to sixty miles an hour; that it went into a skid and continued out of control for approximately three hundred feet, turning around during the course of the skid one and a half times in the road; and that when the Plymouth was eighty to one hundred feet from them, he attempted to run or jump to the east and south to get out of the way, and in so doing he "brushed by" his father.

As the Plymouth automobile entered the curve from the north on its way down the grade, Bussey testified that he saw the two men, the lights from the ditched automobile and the automobile itself all about the same time, that is, when the Plymouth was approximately one hundred seventy feet away from the ditched car, which witness placed just north of the culvert; that upon applying the brakes the Plymouth skidded, turned around one and a half times, so that the rear fender of the car struck the ditched DeSoto at its left rear. This collision tended to straighten witness' automobile on the right side of the highway, so that it came to rest with its front right wheel on the western berm of the road. Bussey further testified that for a moment it seemed to him as if he would pin one or the other of the two Hammersmiths between the two cars.

Decedent's son, Joseph Hammersmith, gave a statement to Corporal Randall that read, in part: "Road dry until we got to this place—we went into ditch."

Defendant Bussey also gave a statement to Corporal Randall to the effect that when he drove the car down the

road in the direction of the culvert, he saw the Hammer-smith automobile in the ditch, and that, "I started to stop and went into a skid. When I first came over the rise, they were in the road, and I just couldn't stop because I was skidding due to the slick road."

Witnesses for plaintiff and the defendants testified variously as to: (1) The position of the ditched DeSoto with reference to the culvert and the eastern edge of the pavement; (2) the weather conditions and the condition of State Route No. 73 between the place where decedent was struck by the Bussey automobile in the direction toward and to Boothsville;.and (3) the speed of the Bussey automobile, as it proceeded around the curve and in the direction where decedent and his son Joseph were flagging the Plymouth.

Corporal C. F. Randall, a member of the West Virginia Department of Public Safety, testifying for the defendants, said that when he arrived at the place where decedent was killed, the DeSoto was "straddle" the culvert on the southerly end, with the left rear wheel on the edge of the road, and the right wheel off the road approximately two feet, so that the front of the car was thrown in a more or less northerly direction. Plaintiff's witness, Carroll Jay, ambulance driver, testified that the DeSoto was on the right side of the road a few feet south of the Corbin Branch road intersection with Route No. 73, headed in a northerly direction, with the rear of the car protruding on the right of way three or four feet. Plaintiff's witness, Larry Bombardier, garage man, testified that the DeSoto was to the south of the culvert in a ditch at about a forty-five degree angle with the left rear wheel on the paved portion of the road. Peter Faini, one of the occupants of the Plymouth automobile, testified on behalf of defendants that the rear end of the DeSoto was about three feet on the paved portion of the road and the front end in the ditch beside the culvert about one foot to the south thereof. The other occupant of the Plymouth automobile, Ralph Calabrese, a witness for defendants, testified that the front end of the DeSoto was in the ditch,

with the rear end on the pavement "2 or 3 feet on the paved section of the road." Bussey's testimony on this point was that the rear end of the DeSoto was three or four feet "out in the road" within two feet of the culvert. Decedent's son, Joseph Hammersmith, testified that the DeSoto skidded at a point south of the culvert, and came to rest approximately forty-two feet south thereof.

The testimony of plaintiff's and defendant's witnesses bearing on the weather conditions and the condition of the road to the north of the ditched automobile in the direction of Boothsville, prior to and at the time decedent was fatally injured, is equally variant. Calabrese testified that as the Plymouth automobile rounded the curve it was "slippery there", but not at the top of the hill. According to the defendant Bussey the road was dry from Pittsburgh to the place where decedent was killed. Corporal Randall testified, as heretofore stated, that the road was slippery from the culvert in a northerly direction about one hundred feet, and that he did not observe the condition of the road north of that point. Decedent's son, Joseph Hammersmith, testified that about three hundred feet to the north of the crest of the hill there was a sign which read: "Slippery When Wet"; that the road was wet for about a thousand feet, that is, from the crest of the hill to a point beyond where the DeSoto automobile had stopped beyond the southerly end of the culvert; that from Boothsville to the culvert the road was wet in spots; that it was wet in a northerly direction toward Boothsville for about four hundred feet; and that it had rained throughout the evening. Defendants' witness Calabrese testified that where plaintiff's decedent was killed the surface of the road was wet from where the Bussey car rounded the curve to the north of the culvert, but such slippery condition did not continue northerly to the crest of the hill.

Joseph Hammersmith testified that the speed of the Bussey automobile, as it came around the curve and down the grade toward the culvert, was fifty-five to sixty miles an hour. Defendant Bussey testified that he was

operating the automobile at a rate of thirty to forty miles an hour.

Bearing on the question of contributory negligence there is little, if any, conflict in the evidence. Decedent's son, Joseph Hammersmith, testified that when the Plymouth came into view, he and his father were standing in the middle of the east lane of State Route No. 73, twenty feet south of the culvert and twenty-two feet north of the ditched DeSoto. This testimony is not contradicted in the record.

As heretofore indicated the circuit court at the close of all the evidence directed a verdict in favor of defendants. We therefore apply the rule in *Fielder, Admx.* v. *Service Cab Co.,* 122 W. Va. 522, pt. 1 syl., 11 S. E. 2d 115: "Before directing a verdict in a defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence."

From the foregoing it appears that taking as true the evidence most favorable to plaintiff, resolving the conflicts in the evidence in plaintiff's favor, and drawing the inferences from the evidence adduced in favor of plaintiff and defendants which are most favorable to plaintiff, it was within the province of the jury to find: (1) That at the place on the curve when Bussey applied his brakes in response to the Hammersmiths' signals, the road was steep and slippery, not only for a distance of approximately four hundred feet north of the culvert, but at spots along the road between Boothsville and the culvert, and that it had been raining during the evening preceding the early morning on which decedent was killed; (2) that defendants' automobile was being operated at a speed of fifty-five or sixty miles an hour, which the jury would have a right to find was an excessive speed in the circumstances of this case; (3) that after applying his brakes, Bussey's automobile skidded for a distance of

three hundred feet; and that from these findings the jury could further properly find that the defendant Bussey was guilty of negligence, which was the proximate cause of decedent's death. Further it was within the province of the jury to find that the defendant Bussey was the servant and employee of the defendant, Lever Brothers Company, acting at the time his automobile struck decedent in the course of his employment, and, therefore, under the doctrine of *respondeat superior,* Bussey's negligence should be charged against his employer, Lever Brothers Company. Likewise, in our opinion, it was within the province of the jury, taking the evidence as true, as we should do under our holding in the *Fielder* case, and resolving the conflicts in plaintiff's favor, as well as taking the inferences most favorable to plaintiff, to find that at the time the Hammersmiths were flagging the approaching Bussey car they were standing to the east of the center of the road, the Bussey automobile being operated to the west of the center line, in which event the question whether decedent was guilty of contributory negligence was for jury determination.

It follows from the foregoing that the learned trial court invaded the province of the jury in directing a verdict in favor of defendants, but the pertinent questions of fact not having been submitted to the jury, we reverse the judgment of the Circuit Court of Harrison County, set aside the directed verdict, and remand this case for a new trial to be conducted in accordance with the principles enunciated herein.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*

GIVEN, JUDGE, dissenting:

I am of the view that the death of the decedent resulted from an unavoidable accident. A short time before the accident, the car in which decedent was riding skidded partly into a ditch, leaving the rear part of the vehicle projecting into the public highway so as to obstruct a

part of the paved portion of the highway. In these circumstances he was under a duty to warn approaching traffic of the danger. He did so, and there is no indication or contention that the warning was given in an improper or negligent manner. It was observed by the defendant a distance of at least three hundred feet from the place where decedent was struck and killed. To have failed to warn approaching traffic of the danger would have been negligence, as all seem to agree, so that, in view of the majority opinion, he may be charged with having been contributorily negligent, regardless of his own actions. I can not agree.

The driver of the Bussey car observed the warning given by decedent and his son a distance of at least three hundred feet from the Hammersmith car, in ample time to have stopped even though the speed at which he was driving was fifty-five or sixty miles per hour, except for circumstances not known to him or which he could not have reasonably expected to exist, in so far as the evidence shows. Thereafter, he used every reasonable effort to stop his car during the time it skidded three hundred feet to the Bussey car. There is not the slightest degree of evidence tending to show that Bussey had failed to do everything reasonably possible to have stopped his car, or to have in any way prevented the accident, after he observed the warnings. In these circumstances, the slightly excessive speed at which Bussey was driving, according to the testimony of decedent's son, could not possibly have been the proximate cause of the death of plaintiff's decedent.

Being of these views, I respectfully dissent. I am authorized to say that Judge Fox joins in this dissent.