337 S.E.2d 2

**Brady C. TOTTEN and Betty Totten**

v.

**Luis P. ADONGAY.**

No. 16432.

Supreme Court of Appeals of
West Virginia.

Oct. 30, 1985.

James W. St. Clair, Marshall & St. Clair, Huntington, for appellant.

Jerry N. Ragan, Wood, Grimm & Delp, Huntington, for appellee.

McGRAW, Justice:

This is an appeal from an order of the Circuit Court of Wayne County awarding Dr. Luis P. Adongay, the defendant in this medical malpractice action, a directed verdict against Brady and Betty Totten, the plaintiffs.

The plaintiffs instituted this action in the circuit court below on October 19, 1981, alleging that the defendant negligently failed to properly diagnose and timely treat an injury to the right wrist of Brady Totten, thereby resulting in further injury to Mr. Totten and concomitant economic losses for both plaintiffs. The case proceeded to trial before a jury on November 17,

1983. At the conclusion of the presentation of the plaintiffs' evidence, the defendant moved for a directed verdict, citing, as grounds therefor, the plaintiffs' failure to offer expert testimony concerning the allegation that Mr. Totten's injuries were caused by negligence or want of skill on the part of the defendant. Upon consideration, the circuit court concluded that the plaintiffs had failed to establish a *prima facie* case and directed a verdict for the defendant. The plaintiffs maintain there was sufficient evidence presented to the jury on the question of the defendant's liability and, therefore, contend in this appeal that circuit court's decision to direct a verdict for the defendant constitutes reversible error.

The well settled rule regarding the presentation of proof relevant to a claim is that when the plaintiff's evidence does not establish a *prima facie* right of recovery, a motion for a directed verdict on behalf of the defendant should be sustained by the trial court. *See, e.g.*, Syl. pt. 3, *Hinkle v. Martin*, 163 W.Va. 482, 256 S.E.2d 768 (1979); Syl. pt. 2, *Pinfold v. Hendricks*, 155 W.Va. 489, 184 S.E.2d 731 (1971); Syl. pt. 1, *Dye v. Corbin*, 59 W.Va. 266, 53 S.E. 147 (1906); Syl. pt. 6, *Hi Williamson & Co. v. Nigh*, 58 W.Va. 629, 53 S.E. 124 (1906). However, it is equally established that a claim should remain within the hands of a jury unless manifest insufficiencies in the evidence compel otherwise. Accordingly, it has long been the rule in this jurisdiction that:

> Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence.

Syl., *Nichols v. Raleigh-Wyoming Coal Co.*, 112 W.Va. 85, 163 S.E. 767 (1932).[1]

---

**1.** *See also* Syl. pt. 9, *Casto v. Martin*, 159 W.Va. 761, 230 S.E.2d 722 (1976); Syl., *Curry v. Heck's, Inc.*, 157 W.Va. 719, 203 S.E.2d 696 (1974); *Howard's Mobile Homes, Inc. v. Patton*, 156 W.Va. 543, 548, 195 S.E.2d 156, 159 (1973); Syl. pt. 1, *Pinfold v. Hendricks*, 155 W.Va. 489, 184

S.E.2d 731 (1971); Syl. pt. 5, *Smith v. Edward M. Rude Carrier Corp.*, 151 W.Va. 322, 151 S.E.2d 738 (1966); Syl. pt. 1, *Duling v. Bluefield Sanitarium, Inc.*, 149 W.Va. 567, 142 S.E.2d 754 (1965); Syl. pt. 4, *Thornsbury v. Thornsbury*, 147 W.Va. 771, 131 S.E.2d 713 (1963); Syl. pt. 1,

Of course, this standard favoring jury determinations on all triable issues inures to the benefit of the nonmoving party, whether it be the plaintiff or the defendant. *See* Syl. pt. 2, *Ashland Oil, Inc. v. Donahue,* 164 W.Va. 409, 264 S.E.2d 466 (1980); Syl. pt. 5, *Young v. Ross,* 157 W.Va. 548, 202 S.E.2d 622 (1974); Syl. pt. 5, *Wager v. Sine,* 157 W.Va. 391, 201 S.E.2d 260 (1973); *Jones, Inc. v. Wiedebusch Plumbing & Heating Co.,* 157 W.Va. 257, 272, 201 S.E.2d 248, 256 (1973); Syl. pt. 1, *Thomas v. Ramey,* 156 W.Va. 191, 192 S.E.2d 873 (1972); Syl. pt. 1, *Lambert v. Goodman,* 147 W.Va. 513, 129 S.E.2d 138 (1963); *Laphew v. Consolidated Bus Lines,* 133 W.Va. 291, 294, 55 S.E.2d 881, 883 (1949); *Adkins v. Raleigh Transit Co.,* 127 W.Va. 131, 135, 31 S.E.2d 775, 777 (1944); *Webb v. Harrison,* 127 W.Va. 124, 130, 31 S.E.2d 686, 689 (1944); *Smith v. Smith,* 125 W.Va. 24, 30, 22 S.E.2d 647, 650 (1942); Syl. pt. 4, *Bank of White Sulphur Springs v. Lynch,* 93 W.Va. 382, 116 S.E. 685 (1923).

Within this procedural context, the broad question in this case is simply whether the plaintiffs met their burden of proof. As stated in Syllabus point 4 in *Hundley v. Martinez,* 151 W.Va. 977, 158 S.E.2d 159 (1967), "In an action for damages against a physician for negligence or want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove such negligence or want of skill and that it resulted in injury to the plaintiff." *See also* Syl. pt. 1, *Hinkle v. Martin, supra;*

Syl. pt. 1, *Schroeder v. Adkins,* 149 W.Va. 400, 141 S.E.2d 352 (1965); Syl. pt. 1, *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964); Syl., *White v. Moore,* 134 W.Va. 806, 62 S.E.2d 122 (1950); Syl. pt. 2, *Dye v. Corbin, supra.*

The plaintiffs' evidence, which, for the purpose of this appeal from a directed verdict for the defendant, must be taken as true and given every favorable inference, reveals the following course of events. During the latter part of September, 1979, Brady Totten injured his right wrist while cutting firewood for home heating use in the coming winter. The pain and discomfort failed to subside, and became a hindrance to Mr. Totten in his work as a mine electrician. Therefore, on October 3, 1979, Mr. Totten consulted the defendant at his clinic office in Crum. Dr. Adongay physically examined the injured area and had x-rays taken. Based upon his examination and reading of the x-rays, the defendant ruled out a fracture or dislocation as the cause of Mr. Brady's discomfort. Dr. Adongay prescribed aspirin, heat and massage as treatment.

However, the pain did not abate, and on October 31, 1979, Mr. Totten again went to the defendant. Again the defendant told him there was no fracture. Nevertheless, Mr. Totten's injury continued to be a source of pain and discomfort. On February 13, 1980, approximately five months after his injury, Mr. Totten went to see Dr. Robert Ashworth, an orthopedic surgeon.

*Spaur v. Hayes,* 147 W.Va. 168, 126 S.E.2d 187 (1962); Syl. pt. 5, *Reilley v. Byard,* 146 W.Va. 292, 119 S.E.2d 650 (1961); Syl. pt. 3, *Costello v. City of Wheeling,* 145 W.Va. 455, 117 S.E.2d 513 (1960); Syl. pt. 1, *Jenkins v. Chatterton,* 143 W.Va. 250, 100 S.E.2d 808 (1957); Syl. pt. 1, *Reese v. Lowry,* 140 W.Va. 772, 86 S.E.2d 381 (1955), *overruled on other grounds,* 163 W.Va. 332, 256 S.E.2d 879 (1979); Syl. pt. 1, *Roush v. Johnson,* 139 W.Va. 607, 80 S.E.2d 857 (1954); Syl. pt. 4, *Montgomery v. Fay,* 139 W.Va. 273, 80 S.E.2d 103 (1954); Syl. pt. 1, *Homes v. Monongahela Power Co.,* 136 W.Va. 877, 69 S.E.2d 131 (1952); Syl., *Hammersmith v. Bussey,* 136 W.Va. 437, 67 S.E.2d 609 (1951); Syl. pt. 3, *Sammons Brothers Construction Co. v. Elk Creek Coal Co.,* 135 W.Va. 656, 65 S.E.2d 94 (1951); Syl. pt. 1, *Frampton v. Consolidated Bus Lines,* 134 W.Va. 815, 62 S.E.2d 126 (1950); Syl., *Perry v. Scott,*

134 W.Va. 380, 59 S.E.2d 652 (1950); *Raeder v. Sconish,* 133 W.Va. 795, 58 S.E.2d 265 (1950); Syl. pt. 1, *Konopka v. Montgomery Ward & Co.,* 133 W.Va. 775, 58 S.E.2d 128 (1950); Syl. pt. 1, *Stokey v. Norfolk & Western Ry. Co.,* 132 W.Va. 771, 55 S.E.2d 102 (1949); *Reed v. Janutolo,* 129 W.Va. 563, 564–65, 42 S.E.2d 16, 17–18 (1946); Syl. pt. 1, *Parsons v. New York Central Railroad Co.,* 127 W.Va. 619, 34 S.E.2d 334 (1945); *Arrowood v. Norfolk & Western Ry. Co.,* 127 W.Va. 310, 316, 32 S.E.2d 634, 637 (1944); Syl. pt. 1, *Boyce v. Black,* 123 W.Va. 234, 15 S.E.2d 588 (1941); Syl. pt. 1, *Fielder v. Service Cab Co.,* 122 W.Va. 522, 11 S.E.2d 115 (1940); Syl. pt. 1, *Burgess v. Sanitary Meat Market,* 121 W.Va. 605, 6 S.E.2d 254 (1940); Syl. pt. 2, *Hambrick v. Spalding,* 116 W.Va. 235, 179 S.E. 807 (1935); *Jameson v. Norfolk & Western Ry. Co.,* 97 W.Va. 119, 120, 124 S.E. 491, 491–92 (1924); Syl. pt. 3, *Estep v. Price,* 93 W.Va. 81, 115 S.E. 861 (1923).

After an examination and x-rays, Dr. Ashworth advised Mr. Brady that there was a fracture in the scaphoid navicular bone of his right wrist which had been present for some time. Dr. Ashworth further advised Mr. Brady that the fracture and continued nonunion of the bone had caused a complete loss of blood supply to part of the bone, thereby resulting in aseptic necrosis. Dr. Ashworth recommended that the dead bone be removed and replaced with a plastic implant.

Mr. Brady brought, to this first examination by Dr. Ashworth, the x-rays taken by Dr. Adongay on October 3, 1979. In deposition testimony taken after the institution of this action, Dr. Ashworth testified that he could see the fracture in Mr. Brady's right wrist on the x-rays taken and read by the defendant.

Mr. Brady was hospitalized from February 21–24, 1980. Dr. Ashworth surgically removed the necrotic bone and replaced it with a prosthetic substitute. Mr. Brady's wrist was in a cast for 4–5 weeks after his release from the hospital. He later underwent physical therapy. At the time of the trial, he had not regained full use of his hand.

At the trial, the plaintiffs first called, as an adverse witness, the defendant. The defendant admitted that Mr. Totten's fracture was shown on the x-ray taken and read in his office on October 3, 1979. Dr. Adongay's explanation as to why he did not diagnose the fracture was that his attention was focused or diverted to where Mr.

Totten was complaining of pain, the middle of the body of the hand.[2]

The only other medical testimony in the plaintiffs' case-in-chief was the deposition testimony previously given by Dr. Ashworth in February of that year. The transcript of this deposition was admitted into evidence and read to the jury. Dr. Ashworth's testimony principally covered the nature of Mr. Totten's injury, his diagnosis and treatment of the problem, and his post-surgery observations of the results of the corrective operation. Dr. Ashworth's deposition also contained testimony concerning his viewing of the x-rays taken and read by the defendant. As previously mentioned, Dr. Ashworth related that the fracture in the navicular bone was shown on the defendant's film. In his deposition, Dr. Ashworth was not questioned upon the proper standard of care in situations similar to the case at hand. Additionally, due to inadequate exposure of the x-ray taken by the defendant, Dr. Ashworth stated that he could not tell whether the bone was already dead at the time the x-ray was taken.

 The trial court's disposition of the case below turned upon the evidentiary hurdle necessarily present in most medical malpractice cases. That is, because medical diagnosis and treatment typically involves professional practices and procedures familiar only to the medical community, it has long been accepted that expert medical testimony delineating the pertinent standard of care is essential to a plaintiff's case. Proof that a physician failed to cure an affliction or effect a perfect remedy for

2. The relevant portion of the defendant's testimony reads as follows:

Q Let's get down to the bottom of it. Did you see a fracture in the wrist of Brady Totten on October 3d, 1979, when you read the x-ray of his wrist?
A No sir.
Q It was there, wasn't it Doctor?
A Yes, sir.
Q Can you tell us why you didn't see it?
A When Brady Totten came on October 3d, 1979, his chief complaint was, if you allow me to read from the chart, that his right hand hurt for about two to three weeks, and on physical examination there was a pressure tenderness right on the middle of the body of the hand and there was no motor deficiency.

What this means is he can move his hands without difficulty, and also he told me that there was no history of injury. So after examining him I took an x-ray of the right hand, and my attention was focused or diverted to where he was complaining, to the middle of the body of the hand, and true indeed there was no broken bone in the middle of the body of the hand, and then I told him to come back in one week.
Q Doctor, isn't it true that the navicular bone is about an inch away from the middle of the back of the hand?
A Yes, sir.

an injury does not alone establish negligence or lack of skill. Moreover, in a normal physician-patient relationship a mere mistake in judgment without a breach of the professional duty of care is not actionable malpractice. *See* Syl. pts. 5 & 6, *Dye v. Corbin, supra.*

■ The requisite expert medical testimony, then, is intended to assist the lay jury in determining whether the injuries incurred by the plaintiff were indeed the result of a breach of the duty of care or lack of requisite skill by the defendant-physician. Syl. pt. 2, *Roberts v. Gale, supra;* Syl. pt. 2, *Hinkle v. Martin, supra;* Syl. pt. 5, *Hundley v. Martinez, supra;* Syl. pt. 2, *Schroeder v. Adkins, supra; White v. Moore,* 134 W.Va. at 814, 62 S.E.2d at 126. As with all general rules, however, there are exceptions. The "common knowledge" doctrine stands as the most notable exception to the expert testimony requirement, and the one relevant to the immediate case.[3] The essence of this exception is simply that certain medical situations present routine or noncomplex matters which are cognizable under the common knowledge or experience of lay jurors and, therefore, the presence or absence of negligence can be determined without resort to expert testimony. Accordingly, this Court has, on two previous occasions, held that, "It is the general rule that want of professional skill can be proved only by expert witnesses. However, cases may arise where there is such want of skill as to dispense with expert testimony." Syl., *Buskirk v. Bucklew,* 115 W.Va. 424, 176 S.E. 603 (1934); Syl. pt. 2, *Howell v. Biggart,* 108 W.Va. 560, 152 S.E. 323 (1930).[4]

■ It is the specific contention of the plaintiffs that the "common knowledge" exception was applicable under the circumstances presented in the instant case, thereby precluding an adverse directed verdict for lack of expert testimony. We agree.

A reading of the trial record indicates to us that additional medical testimony in the plaintiffs' case-in-chief may have been helpful to a jury determination on the question of negligence. However, we decline to hold that expert medical testimony was necessary as a matter of law in this case. Although the evidence of record presents a very close case concerning the applicability of the "common knowledge" exception, we resolve the question in the plaintiffs' favor, in substantial part, due to the admitted immediate proximity of the actual injury to the point of complaint. The plaintiffs' evidence, given the benefit of all favorable inferences, would permit a jury to conclude that failure to detect a fracture admittedly shown on an x-ray of the injured area was the result of a breach of due care or lack of the minimum degree of skill commensurate with the circumstances. A jury, relying upon common knowledge as they do in nonmalpractice injury cases, would have a sufficient basis for a conclusion as to the reasonableness—the essence of any negligence determination—of the defendant's oversight.[5]

In medical malpractice cases where lack of care or want of skill is so gross, so as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience, failure to present expert testimony on the accepted standard of care and

---

3. *Res Ipsa Loquitur* may also be applicable in some cases.

4. The plaintiffs also cite the Court's decision in *Jenkins v. Charleston General Hospital & Training School,* 90 W.Va. 230, 110 S.E. 560 (1922), as factual support for recognition of the common knowledge exception in the instant case. Although *Jenkins* presents similar facts, the expert testimony issue was not directly addressed.

5. We note that in a 1906 decision this Court cited authority for the proposition that evidence of a physician's failure to discover a fracture, standing alone, does not establish want of care. *Dye v. Corbin,* 59 W.Va. 266, 273, 53 S.E. 147, 150 (1906). The defendant-physician's diagnosis in that case was conducted without the benefit of x-rays, a diagnostic tool presumably of limited availability in rural Ritchie County in 1906. Even today, the proposition stated in *Dye* remains valid in the majority of malpractice cases. In the instant case, however, the reasonableness of the defendant's care, or lack thereof, is within the common understanding of a modern jury.

degree of skill under such circumstances is not fatal to a plaintiff's *prima facie* showing of negligence. Of course, the defendant is free to present evidence tending to show that the care given was reasonable under the circumstances or within acceptable bounds. The common knowledge exception merely allows, in rare cases, the submission of the case to the jury without expert testimony. In instances such as the case at hand, where the treating physician testified that the fracture was shown on the x-ray, and was only one inch away from the point where the physician says the patient was complaining of pain, it strains common credulity to suppose, as the defendant suggests, that a jury is incapable of understanding the diagnosis without the aid of expert testimony.

■ Additionally, we note that as an alternative basis for the trial court's directed verdict the defendant contends that the plaintiffs failed to present sufficient proof, expert or otherwise, on the element of proximate cause. Essentially, the defendant contends the plaintiff failed to prove that his bone condition was still repairable at the time of his first visit to the defendant. Although the defendant raises this bootstrap argument in defense to the claim, unfortunately, only a correct diagnosis and treatment upon the initial visit would have rendered the question answerable with certainty. With this point in mind, there is a certain ring of unfair advantage in the raising of the causation issue in cases such as this one. If the jury, in determining the primary issue were to find negligence in this case, then the causation argument borders upon frivolity.

At the very least, if the jury concluded that the bone was beyond saving at the time of Mr. Totten's first visit to the defendant, the evidence of misdiagnosis would still permit a finding in favor of the plaintiffs for the pain and suffering incurred during the five-month interval until the correct diagnosis by Dr. Ashworth. Furthermore, Dr. Ashworth stated in his deposition that although he could not say when the fracture occurred, the fracture was the cause of the initial blood loss, which in turn resulted in the eventual asceptic necrosis of the bone; and that the possibility of saving the bone diminished substantially after the initial 4–6 week period after the injury. The testimony of the Tottens would have permitted the jury to conclude that the initial injury to Mr. Totten's wrist occurred while chopping wood in mid-September of 1979. Therefore, based upon the medical testimony of Dr. Ashworth and the Tottens' testimony, the jury could have further concluded that proper diagnosis and timely treatment by the defendant probably would have prevented the eventual deterioration of the bone fragment.[6]

In many cases the cause of injury is reasonably direct or obvious, thereby re-

---

**6.** The following excerpt from Dr. Ashworth's testimony illustrates the range of possible conclusions discussed above:

Q At some point after the fracture occurred, the dye was cast, so to speak?

A Right.

Q Are we talking there in terms of weeks, or months, or years, or what, Doctor?

A Well, I would say in order to get this thing—to get a blood supply re-established, you'd have to do this thing within four to six weeks.

Q After the initial injury?

A After the initial injury.

Q That would not be four to six weeks after the first symptom of pain?

A No.

Q Doctor, would you agree that the necrotic process itself could be the cause of pain which could be a first symptom?

A Yes. That's what I was trying to establish.

Q That's the most probable cause of pain in the absence of trauma?

A No, sir. I think you have to have trauma to cause a fracture. You would have initial pain which might subside after a week or two. Then he might be relatively symptomatic until this aseptic necrotic process developed.

Q And then when the necrotic process developed, a symptom would be pain?

A Correct.

Q And that could be pain such as he related back to September 15, 1979?

A Correct.

Q And if we assume that that pain in September of 1979 was caused by the necrotic process, you would agree, would you not, Doctor, that it was too late to reverse the process then?

A That's true.

**640**

moving the need for medical testimony linking the negligence with the injury. Additionally, "[d]irect testimony, expert or otherwise, is not always necessary to prove the causal connection between the negligence or wrong of a tortfeasor and the injury suffered by the victim. Circumstantial evidence may be sufficient." *Smith v. Slack,* 125 W.Va. 812, 818, 26 S.E.2d 387, 390 (1943). In other instances, medical testimony is warranted to establish the proximate cause link between the claimed negligence and injury. Under established principles, the lay and medical testimony in this case, taken together, presented a reasonable basis for a proper finding on proximate cause.

Medical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant. All that is required to render such testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant.

Syl. pt. 1, *Pygman v. Helton,* 148 W.Va. 281, 134 S.E.2d 717 (1964). *See also* Syl. pt. 3, *Hovermale v. Berkeley Springs Moose Lodge,* 165 W.Va. 689, 271 S.E.2d 335 (1980); Syl., *Serbin v. Newman,* 157 W.Va. 71, 198 S.E.2d 140 (1973); Syl., *Foose v. Hawley Corporation,* 120 W.Va. 334, 198 S.E. 138 (1938).

For the foregoing reasons, we find the trial court's decision to direct a verdict for the defendant to be error.

Reversed and Remanded.

NEELY, Justice concurring in part and dissenting in part:

Carefully examined, this case leads to an ironic conclusion. The majority is correct that there was sufficient evidence to allow the case to go to the jury; however, there was not sufficient evidence to allow the jury to return a verdict for more than the cost of Dr. Adongay's services and some nominal amount for pain and suffering. Without expert evidence, the jury could not have drawn conclusions concerning when the bone died or, more importantly, whether the surgery performed to repair the hand was inevitable or could have been prevented by Dr. Adongay's proper diagnosis. Accordingly, had the trial court allowed the case to go to the jury, and had the jury returned an award satisfactory to the plaintiff, that award would inevitably have warranted reversal or appeal.

The reason that I have taken the time to concur in part and dissent in part in a case that appears to be of little moment is simply to point out that it is stupid to try any malpractice case, no matter how outrageous, without the help of an expert witness. The majority opinion has done substantial justice in the case before us, but it should not be read to authorize submission of malpractice cases to the jury in future cases on the basis of lay evidence alone.