JOHN HARRISON SMITH, *Administrator, Etc.*

*v.*

VIRGINIAN RAILWAY COMPANY

(No. 10901)

Submitted January 21, 1958.  Decided February 18, 1958.

*W. Graham Smith, Jr., Harry W. Hill, Bias & Bias,* for plaintiff in error.

*Slaven & Staker, Lant R. Slaven, Walter C. Plunkett, Gen. Manager, Virginian Ry. Co.,* Norfolk, Va., *John M. Rush,* for defendant in error.

RILEY, JUDGE:

In this action of trespass on the case, instituted in the Circuit Court of Mingo County, John Harrison Smith, Administrator of the Estate of Romaine Pinky Smith, an infant, who at the time of her death was eleven years and one month old, sought to recover damages from Virginian Railway Company, a corporation, for the alleged wrongful death of plaintiff's decedent. This writ of error is prosecuted to the order of the Circuit Court of Mingo County, entered at the conclusion of plaintiff's testimony, which struck out all the evidence, and directed a verdict for the defendant, and judgment was then entered on the verdict as directed.

The defendant, Virginian Railway Company, successor in line of title to several predecessors, constructed in 1931 or 1932 its railroad through an unincorporated village in Mingo County, designated on a recorded plat as "Justice City", hereinafter referred to as "Justice". In doing so, defendant excavated, shot out and removed a rock cliff on its right of way in Justice for a distance of several hundred feet. Defendant's right of way was acquired in 1905, and in 1907 the owners of the land on both sides of the right of way, and now on both sides of the railway, subdivided some twenty or thirty acres of land into a site for an unincorporated town or village. A map of the unincorporated town or village is duly recorded in the office of the Clerk of the County Court of Mingo County, and contains about three hundred building lots, with streets and alleys marked on the plat.

In the construction of the railway company's right of way, the defendant company excavated and removed a portion of the cliff at the point of the accident, which left an almost perpendicular wall on "Deepwater Street", as shown on the recorded plat, above the streets and higher on the cliff near its top, and about forty feet from the railway company's tracks. Deepwater Street, as shown on the plat, parallels defendant's right of way throughout the

unincorporated village of Justice; and said railroad right of way and Deepwater Street abut.

On the day that plaintiff's decedent was killed, she was attempting for the first time in her lifetime to ride a bicycle on Deepwater Street.

About twenty-five years before decedent's death, the railroad company had built its track through Justice, and during that time there had been no guardrail separating defendant's right of way from Deepwater Street, as shown on said plat. When killed, decedent, while attempting to ride a bicycle on Deepwater Street, plunged over the precipice, fell to the roadbed of the defendant railway company, and was fatally injured.

This record discloses that by deed dated September 2, 1905, L. S. Justice and James F. Beavers conveyed to The Deepwater Railway Company, a corporation, a strip of land one hundred feet wide for the purpose of constructing a railroad thereon, described according to the description of the railroad line as designated in the deed of September 2, 1905, which deed provided for "two convenient *farm* crossings at grade." Title to this railroad right of way passed to Virginian Railway Company on April 22, 1907; to Virginian and Western Railway Company on January 2, 1929; and then back to the defendant, Virginian Railway Company, on August 1, 1936.

After the location of the proposed railroad was made and the acquisition of the right of way by the deed of September 2, 1905, L. S. Justice, having acquired title to the adjoining land from Beavers, on April 5, 1907, caused to be recorded in the office of the Clerk of the County Court of Mingo County the original map showing the layout of the unincorporated town or village, together with a writing signed by L. S. Justice and her husband, stating that "The streets and alleys laid out in said plat are hereby dedicated to the public use."

In these circumstances in 1931 or 1932, the Virginian and Western Railway Company constructed its railroad

line running from a point in the Commonwealth of Virginia, some distance to the east of Justice, and extending to Gilbert in Mingo County, which is to the west of and down the Guyandotte River from the unincorporated village of Justice; and located and constructed the railroad on its right of way acquired as aforesaid from Justice and Beavers for railroad purposes under the deed of September 2, 1905.

Involved in this action is the portion of the property designated on the recorded plat, which is sometimes referred to in the record as the "northeast" portion, lying north of the right of way and the railroad thereon; and on the opposite side of the railroad from the main portion of the unincorporated village of Justice, situated on flat land adjacent to the Guyandotte River. This "northeast portion" covers the land east and northeast of Walnut Street, as shown on the recorded plat. The land in this area is rolling and in the nature of a tableland or plateau on the lower slope of the mountain to the north.

Travel from the main portion of the town and United States Route No. 2, which runs through the village, is by crossing the railroad at the street on the recorded plat designated as "Division Street"; thence to the right and east up Deepwater Street on a steep and rising grade. At the time of the construction of the railroad in 1931 or 1932, no one had ever lived in this northeast section of the unincorporated village; no houses had been constructed there; and no use whatever had been made in that locality, including but not limited to Grace Street, as shown on the plat, and Deepwater Street, which appears on the plat as running below and to the west of Grace Street, and that part of Deepwater Street which is above and to the east of Grace Street. For the first time in 1935, after the railroad had been built and was in operation, the first house was built in that section of the unincorporated village near where decedent was killed.

In the construction of the railroad on the right of way acquired for that purpose in 1905, and in order properly

to grade the railroad, it became necessary to make a cut opposite the northeast section of the unincorporated village, as shown on the recorded plat, through the lower part of the mountain or hill on top of which this northeast section is situated. This cut created what has been referred to in this record as a "cliff" to the north of the railroad roadbed, which is actually on the north side of defendant's railroad cut.

From the photographs exhibited in this record, it appears that the hillside was in its natural state a very steep hillside. The railroad cut was entirely on defendant's right of way. The top of the northern edge of the cut did not extend to the northern edge of the railway company's right of way, but the cut ends eighteen and one-half feet short of the northern edge of the right of way, which is also the south edge of Deepwater Street, as shown on the recorded plat. This distance of eighteen and one-half feet between the edge of the cut and the south edge of Deepwater Street is the original or natural ground, which was not changed or disturbed by the railway company's construction of the railroad, and, is according to plaintiff's engineer Linkous, very steep ground on a grade of twenty per cent. At the point on Deepwater Street where the decedent rode to her death into the railroad cut, the height of the cut is thirty-four feet.

Since 1935 a total of thirteen houses has been built on the bluff of the unincorporated village of Justice in the area involved in this case. Five of these houses are fenced in, namely those of plaintiff, John Harrison Smith, decedent's father, the Mullins and Harmon houses adjoining the Smith house, and the houses of Homer Walsh, Courtney Toler and Horace Vance. The remainder of the area in which these houses have been erected, including the Smith home, is an open field grown up in grass and weeds.

Travel by the public in the area in which decedent was killed has not been by definite route or routes, but people travelled over the open field area as they might choose. The only travelled way in that area, as customarily used

by the public and openly shown and existing on the ground, is described in the record as "the public travels from the railroad crossing up Deepwater Street, to the east and up the hill, to the intersection of Deepwater Street with Grace Street; then the open, apparent and used road turns sharply to the left up Grace Street in front of the home of the plaintiff and in part in front of the homes of Mullins and Harmon, then turns obliquely to the right, to the northeast, crossing Lots 10, 9, 8 and 7 in Block 11, which is open field [as shown on the plat] to the northerly end of the alley in front of the Walsh home on Lots 17 and 18 in Block 11; thence continuing up the alley. The open field lots so crossed by this publicly travelled road or way are owned by Snodgrass Motor Company, of which C. H. Peak is president." This open field has been used by the public with the tacit consent of the owners. This allegedly publicly travelled road has been improved from time to time by the residents living in that section of Justice at their own expense, especially in July, 1955, by bulldozing and dumping "red dog" on the publicly used road.

Prior to July 12, 1955, there had been no real use of the eastern part of Deepwater Street by the public in any manner. On that date, however, and in connection with the bulldozing being done on Deepwater Street west of Grace Street, some of the residents in that section of the village "chipped in" and had "just a little bulldozing" done on the eastern part of Deepwater Street beginning at Grace Street, extending past Lots 12 and 13 in Block 11, as shown on the plat, and up the alley through Block 11 to the Walsh home.

No work of any kind had been done on the eastern part of Deepwater Street by any public authority, nor has any public money been expended thereon.

In the process of bulldozing the eastern part of Deepwater Street, the dirt was turned by the bulldozer toward the railway company's right of way, so that at the edge of the area of the bulldozing, a distance of ten feet

from the southerly edge of Deepwater Street and the railway right of way, there was created and there existed at the time of decedent's death a bank four feet in height. From the foot of this bank, ten feet of the ground extending to the northerly line of defendant's right of way with a grade of twenty per cent, which grade obtains from the foot of that four-foot bank for a total distance of eighteen and a half feet from the ground, was still in its natural state.

This record shows no evidence of knowledge on the part of the Virginian Railway Company of any use of the eastern part of Deepwater Street in any manner at any time; and that no complaint had been made in connection with the construction and maintenance of the railroad cut during the twenty-five years throughout which trains have regularly and daily operated on the railway through Justice; nor had any accident occurred by reason of such railway cut.

On Sunday, June 17, 1956, the day on which decedent was killed, the plaintiff and his wife, parents of the decedent, left at their home unattended by any adult their three children to go to Isban, eighteen miles away. These children were Kelly Smith, ten years of age, Robert, six years of age, and the decedent, Romaine Pinky Smith, eleven, the latter of whom was a fourth grade student, recently promoted to the fifth grade, a well behaved child of average intelligence. Upon leaving their home, the decedent's parents told the children, "Don't you kids go down around the hill, stay right here", and the children replied that they would do as they had been told. Decedent's brother, Kelly Smith, owned a boy's bicycle, which he could ride. Decedent had never ridden a bicycle.

After the parents left, the children decided among themselves that decedent should try to learn to ride the bicycle. These efforts were carried on for a while in front of the Smith home, but later decedent and her brother went over to the bulldozed area on east Deepwater Street, which was grown up in weeds and grass, as heretofore stated,

where no bicycle riding had ever previously taken place, so the record shows.

On the first try to ride in the bulldozed area on the eastern part of Deepwater Street, decedent rode westward down on Deepwater Street, then she rode to the point on that street where the bicycle was caused to make an "S" turn, and go over the four-foot bank to the southern edge of the bulldozed area. As decedent rode over the four-foot bank, her brother, Kelly Smith, ran after her and tried to catch her, but she was gone. After plunging down the bank, the bicycle crossed the ten feet of steep natural ground between the bank and the edge of Deepwater Street, entered upon the railway company's right of way, crossed the eighteen and a half feet of steep natural ground between the right of way line and the edge of the cut, and plunged over the cut.

It is on the basis of the foregoing facts that the Circuit Court of Mingo County entered the order to which this writ of error is prosecuted.

The plaintiff relies upon American Law Institute, Restatement of the Law of Torts, Vol. 2, Section 369, which reads:

> "*A possessor of land abutting upon a public highway is subject to liability for bodily harm caused to young children by an excavation or other artificial condition maintained by him thereon so close to the highway that it involves an unreasonable risk to such children because of their tendency to deviate from the highway.*

> "Comment:

> "*a.* The rule stated in this Section requires the possessor to take into account the known tendency of children to deviate slightly from the highway. Therefore, within the area of this expectable deviation the possessor is under a duty to place uninsulated electric wires out of reach of children and to guard excavations and other conditions which are peculiarly dangerous to children because of their childish inability to ap-

preciate the full extent of the risk involved therein.

"*b.* The rule stated in this Section applies not only to artificial conditions created after the highway is dedicated but also to artificial conditions created prior thereto. In this respect, it differs from the duty to remove or guard excavations created so close to a highway that adult travelers upon the highway may be brought into contact with them by some incident of careful travel.

"*c. Area of expectable deviation.* The rule stated in this Section is incapable of any more definite statement. Both in determining the area of expectable deviation and the character of the conditions, the maintenance of which makes the possessor subject to liability, account is to be taken of the public interest in not unduly restricting the possessor's legitimate use of his land. Therefore, the rule stated in this Section does not require the possessor of even unfenced land to use care to make the whole area of it safe for children roaming at large thereon. The area of expectable deviation may be described as including only that portion of the land which is immediately contiguous to the highway. The structures or conditions, the maintenance of which renders the possessor subject to liabilty, are primarily those which are unnecessary for the proper use of the premises or which, if necessary, can be located in a less dangerous place or can be guarded against the deviations of children without substantially interfering with their utility and without an expense which would make their use impracticable.

"*d.* The maintenance of a fence and the character thereof are important factors in determining whether the possessor of land is required to expect that children may deviate thereon. A fence of such height as to be likely to be effective in keeping off the land children of such tender age as to make their deviation innocent and expectable is, in the absence of knowledge that it has proved ineffective, sufficient to prevent a possessor from being subject to liability."

In deciding this case, we note that this record discloses that Deepwater Street is a "highway" in the sense that the word "highway" is a generic term. See 17 M. J., Streets

and Highways, Section 2. Never, however, having been accepted by the public either by formal acceptance or by the use of public moneys in the improvement thereof, it is not a highway under Section 28, Article 1, Chapter 40, Acts of the Legislature, Extraordinary Session, 1933, now contained in Michie's Code, 1955, Annotated, Chapter 17, Article 1, Section 28, which reads: " 'State road' shall include all roads classified and prescribed as 'primary roads' and 'secondary roads'. 'Public roads' shall mean all other roads and bridges under the control of the county court or the governing body of a municipality." See also *State ex rel. Robertson et al. v. State Road Commission,* 135 W. Va. 562, 64 S. E. 2d 28; *Sturm et al. v. The City of St. Albans,* 138 W. Va. 911, 78 S. E. 2d 462.

It follows that the norm stated in American Law Institute, Restatement of the Law of Torts, relied upon by the plaintiff is not applicable to the case at bar.

The case of *Reed* v. *Janutolo,* 129 W. Va. 563, 42 S. E. 2d 16, is not in point, in that the defendant here, unlike the defendant in the *Janutolo* case, had no knowledge that children were wont to play in and about the dangerous instrumentality which the defendant had created.

For the foregoing reasons the judgment of the Circuit Court of Mingo County, in striking plaintiff's evidence and directing a verdict for the defendant, Virginian Railway Company, is affirmed.

*Affirmed.*