599 S.E.2d 769

**Lisa AKERS, Plaintiff Below, Appellant**

v.

**CABELL HUNTINGTON HOSPITAL, INC., Defendant Below, Appellee.**

No. 31586.

Supreme Court of Appeals of West Virginia.

Submitted March 9, 2004.

Decided May 27, 2004.

Dissenting Opinion of Chief Justice Maynard July 2, 2004.

---

Starcher, J., filed concurring opinion.

Maynard, C.J., filed dissenting opinion.

Nancy S. Brewer, Legal Aid of West Virginia, Huntington, West Virginia, Attorney for the Appellant.

Thomas L. Craig, Molly K. Frick, Bailes, Craig & Yon, Huntington, West Virginia, Attorneys for the Appellee.

ALBRIGHT, Justice.

Lisa Akers appeals from the January 3, 2003, order of the Circuit Court of Cabell County through which the trial court directed a verdict in favor of Appellee Cabell Huntington Hospital, Inc., ("Hospital") in connection with the sexual harassment and reprisal lawsuit she brought against the Hospital.[1] In granting a directed verdict, the lower court ruled that Appellant's failure to introduce the testimony of a psychiatrist for the purpose of causally connecting her alleged medical injuries to the allegations of sexual harassment was fatal to her claim based on the trial court's position that Ms. Akers only sought damages for specific psychological conditions.[2] Upon our full review of the record submitted in this case, we determine that the lower court committed error by refusing to allow Appellant's case to proceed to the jury in view of the fact that she demonstrated a *prima facie* case of sexual harassment and because she sought incidental damages in addition to specific damages for her alleged psychological injuries. Accordingly, we reverse and remand.

---

1. Ms. Akers initially included her supervisor, Larry Ball, as an individual defendant in the lawsuit, but she voluntarily dismissed him from the action prior to trial.

2. According to the trial court's order, Appellant sought recovery for "major depression, acute situational anxiety, and post-traumatic stress syndrome."

I. Factual and Procedural Background

Appellant was hired by the Hospital on August 4, 1983, to work as a registrar in the admissions department. In 1991, she applied for and received an internal transfer to the Hospital's medical records department. In her position as a Medical Records Technician I, Appellant was responsible for retrieving patient's medical charts per the requests of physicians; obtaining the physicians' signatures with regard to the removal of those charts; and refiling those same documents upon their return. Within a short time of her transfer to the medical records department, Appellant alleges that her supervisor, Larry Ball, who was the Director of Medical Records, began subjecting her[3] to various inappropriate and offensive acts that were sexually suggestive. Those acts included unsolicited and improper physical contact; emotionally abusive and intimidating comments; and threatening remarks involving a knife.

After complaining about Mr. Ball's allegedly offensive behavior and comments to her immediate supervisor, Ginger Charles, her complaints of sexual harassment were made known to Mr. Ball in Appellant's presence during a meeting that took place on December 7, 1993. Within six weeks after this meeting, a flurry of disciplinary write-ups regarding Appellant's work performance were lodged by the Hospital. The record indicates that there were seven disciplinary actions filed against Appellant between February 3, 1994, and April 26, 1994.[4] In connection with the final disciplinary incident[5] during this period, Appellant was suspended

for a three-day period. Ms. Akers views this rash of disciplinary actions as retaliation taken by the Hospital in connection with the complaints she voiced about Mr. Ball's alleged sexual harassment of her.[6]

In September 1994, Appellant's office location was physically moved from what was referred to as the "bullpen"—the main location of medical records—to a workspace across the hall. Although she was still classified as Medical Records Technician I, Appellant's duties changed from obtaining physicians' signatures to verifying that the doctors had completed their patients' medical records before such records were bound and entered into the medical records archive. Despite this modification in job duties, Appellant's wage rate, benefits, and hours of employment remained the same.

Appellant's last date of active employment at the Hospital was December 11, 1996. On this date, Appellant took a medical leave of absence, alleging that she was unable to perform her job duties as a result of ongoing harassment from Mr. Ball.[7] To this date, Appellant has not returned to work at the Hospital. The Hospital maintains it never terminated Appellant,[8] and that upon the presentation of a physician's release combined with the availability of a position for which she is qualified, Ms. Akers can be returned to active employment.

On May 11, 1998, Appellant filed a complaint in the circuit court against both the Hospital and Mr. Ball,[9] alleging sexual harassment and reprisal in connection with her reporting of Mr. Ball's alleged inappropriate conduct. Through her complaint, Ap-

3. In her complaint, Appellant avers that Mr. Ball's inappropriate conduct was not limited to her, but extended to other female Hospital employees.

4. Prior to this time, Appellant had been the subject of three disciplinary events: two informal warnings and one verbal counseling for tardiness; not following Hospital procedures; and improperly prioritizing job duties. Two of these events occurred while Appellant was employed in Admissions.

5. The record reflects that this disciplinary event involved Appellant's "failure to follow clocking and overtime procedures and policies."

6. The Hospital vehemently disputes this claim and maintains that each disciplinary action taken against Appellant was justified and is supported by proper documentation.

7. Appellee points out that on the same date Appellant went on a medical leave she was diagnosed in the Hospital's emergency room as having a possible sarcoidosis, which is a cyst in the lungs.

8. At trial, the Hospital took the position that Appellant was on an extended medical leave of absence.

9. *See supra* note 1.

pellant avers that she suffers from depression, post-traumatic stress disorder, and acute situational anxiety disorder as a result of the alleged sexual harassment. Appellant claims that the onset of these psychological disorders have permanently and totally disabled her from being gainfully employed.

The trial of this matter commenced on November 6, 2002. At the end of Appellant's case-in-chief, the Hospital moved for a directed verdict. The Hospital argued that Appellant had failed to prove a *prima facie* case of sexual harassment because no "qualified medical expert [came] forward to testify that the underlying medical condition from which [she] suffer[ed] was actually or proximately caused by" the alleged sexual harassment. In granting the directed verdict, the trial court reasoned that Appellant was required to introduce testimony from a psychiatric expert "to prove that the Defendant's conduct caused her injury," based on her structuring of the case around a medical condition. The trial court denied Appellant the opportunity to present her case to the jury based on its view that her psychological injuries could not be established without the expert testimony of a psychiatrist.

In response to the trial court's granting of a directed verdict, Appellant moved for a new trial and the trial court denied this motion. Appellant seeks a reversal of the trial court's rulings on the granting of a directed verdict and the denial of a new trial, and requests that she be permitted to present her case to a jury.

## II. Standard of Review

■ As we explained in syllabus point three of *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996),

The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a directed verdict when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling

granting a directed verdict will be reversed.

On the issue of inferences, we recognized in syllabus point one of *Jenkins v. Chatterton*, 143 W.Va. 250, 100 S.E.2d 808 (1957):

"Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence."

*Id.* at 250–51, 100 S.E.2d at 808 (quoting Syllabus, *Nichols v. Raleigh–Wyoming Coal Co.*, 112 W.Va. 85, 163 S.E. 767 (1932)).

With these standards in mind, we proceed to determine whether the trial court committed error in granting a directed verdict to the Hospital.

## III. Discussion

### A. *Prima Facie* Case

■ Appellant argues that based on her clear demonstration of the required elements of a *prima facie* claim of sexual harassment, the trial court erred in granting the Hospital a directed verdict. In syllabus point five of *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995), we held:

To establish a claim for sexual harassment under the West Virginia Human Rights Act, W.Va.Code, 5–11–1, *et seq.*, based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

Contending that each of these four elements was established in her case in chief, Appellant argues that the lower court's decision to grant a directed verdict was contrary to well-established law.

■ We identified the type of conduct that qualifies as sexual harassment in syllabus point seven of *Hanlon:*

An employee may state a claim for hostile environment sexual harassment if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment.

195 W.Va. at 103, 464 S.E.2d at 745. In *Conrad v. Szabo,* 198 W.Va. 362, 480 S.E.2d 801 (1996), we expanded on the type of evidence and factual inquiries that are relevant to a sexual harassment case:

We said in *Hanlon* that hostile environment sexual harassment can occur "when the workplace is infected, for example, by sexual barbs or innuendos, offensive touching, or dirty tricks aimed at the employee because of her gender." ... [T]he key inquiries are whether the mistreatment was directed at the plaintiff because she was a woman *and* whether it was of such a nature, because of its seriousness or its pervasiveness, as to ruin the working environment for the plaintiff.... "Hostility" in these cases ... turns on what effect the conduct would have, cumulatively, on a reasonable person.

*Id.* at 371, 480 S.E.2d at 810 (citation omitted).

■ We cautioned circuit courts in *Szabo* to be judicious about awarding summary judgment in sexual harassment cases, given the presence of factual issues regarding the discriminatory animus of an employer in a sexual harassment case. Assuming evidence of a *prima facie* case of sexual harassment has been shown, we noted in *Szabo* that unless "only one conclusion could be drawn from the record in the case," the case presents factual issues which require a jury to resolve. *Id.* at 370, 480 S.E.2d at 809. These same concerns of favoring jury resolution, barring a clearly one-sided case, apply equally to a trial court's consideration of a directed verdict motion. In this case, we note that the lower court never ruled that

Appellant had failed to demonstrate a *prima facie* case of sexual harassment; the only flaw the trial court identified in her case was the absence of medical testimony causally linking Appellant's injuries to the actions of the Hospital.

From our review of the record, it is clear that a *prima facie* case of sexual harassment was presented. Appellant testified at trial regarding the events upon which she based her claim of sexual harassment. In explanation of her claim that Mr. Ball "was over friendly and ... overly touching," she stated that:

"He would always—any chance he got, when you had to approach him to ask him for something or if he approached you, he always made sure that he had his body pressed up against you, either fully from the back or to the side. He would put his arm around me constantly massaging my shoulders."

"If I was sitting down, he would come up and actually put his pelvic area against the back of your [my] chair and then he would stand there and rock your [my] chair back and forth. He would stand over the top of you so he could look down your blouse."

When she had to discuss a medical record with Mr. Ball, Appellant testified that:

"I would approach him and at first I would, you know, stand beside him. And I would be the one holding the chart. And as he was turning the pages, he would brush his hand against your [my] breast every time you [I] turned the page. And I tried to move away from him and step away from him, and it didn't help."

While no one witnessed these events,[10] two of her co-workers, and her supervisors testified that Appellant had described these types of incidents to them as having occurred.

Appellant's testimony clearly demonstrated that the alleged conduct of Mr. Ball was unwelcome and that the conduct in issue stemmed from her sex. Her testimony further addressed the pervasiveness of the conduct; how her conditions of employment

---

**10.** *See Price v. City of Charlotte,* 93 F.3d 1241, 1254 (4th Cir.1996) (holding that "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation," but requiring that testimony establishing such injury "must be sufficiently articulated" and not "conclusory" in nature).

were altered; and how the conduct affected her mental state. Because the conduct at issue was that of a Hospital supervisor, there is no difficulty imputing Mr. Ball's alleged conduct to the Hospital. Thus, Appellant met the four required elements of demonstrating a *prima facie* case of sexual harassment under this Court's holding in *Hanlon*. *See* 195 W.Va. at 103, 464 S.E.2d at 745, syl. pt. 5.

■ As the non-moving party on the directed verdict motion, Appellant was entitled to " 'every reasonable and legitimate inference fairly arising from the testimony.' " *Jenkins*, 143 W.Va. at 250, 100 S.E.2d at 808, syl. pt. 1, in part. Based on the evidence presented and the inferences arising from Appellant's case in chief, which suggested that sexual harassment may have occurred, the trial court should have permitted the jury to decide whether it believed Appellant's allegations of sexual harassment. Accordingly, we hold that once a plaintiff in a sexual harassment case introduces evidence that demonstrates the four elements set forth in syllabus point five of *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995), he/she has proven a *prima facie* case of sexual harassment, which must then be presented to the jury.

Rather than granting the directed verdict based on Appellant's failure to establish a *prima facie* case of sexual harassment, the trial court essentially decided that she could not could prove any damages arising from her claim. Because there were no economic damages at issue in this case, the trial court limited its analysis to two types of damages: damages arising from an alleged medical condition and noneconomic damages that are incidental to the act of sexual harassment. With regard to Appellant's ability to demonstrate her entitlement to damages arising from a medical condition, the trial court fo-

cused on whether she introduced sufficient evidence to link her alleged medical injuries to the alleged sexual harassment. After considering the testimony of Appellant's family physician and her counseling psychologist, as well as the training and background of these two witnesses, the trial court concluded that neither of these witnesses had the necessary expertise to testify for the purpose of connecting her alleged medical injuries to the subject allegations of sexual harassment.[11] Based on the limited expertise of these two witnesses and the failure of Appellant to causally connect her alleged medical injuries to the alleged acts of Mr. Ball, the trial court determined that she could not establish any damages associated with her alleged medical injuries.

■ By granting a directed verdict based on her failure to establish damages arising from an alleged medical condition, Appellant contends that the trial court misapprehends what is required to prove sexual harassment. She correctly observes that a statutory claim brought under the West Virginia Human Rights Act[12] to establish sexual harassment does not require proof of psychological injury. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the United States Supreme Court ended the ongoing debate over whether evidence of psychological injury was required to succeed in a sexual harassment case. Adopting a middle ground between "making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury," the high Court in *Harris* recognized that "[a] discriminatorily abusive work environment, *even one that does not seriously affect employees' psychological well-being,* can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." 510 U.S. at 21–22 (emphasis supplied). Rejecting

---

11. As to Appellant's counseling psychologist, Dr. Geronilla, the trial court found that she did not have "the educational background or experience to make a clinical diagnosis of a psychiatric medical condition, prescribe, or evaluate clinical drug therapy, or undertake any clinical psychology work." With regard to Appellant's family physician, Dr. Brownfield, a licensed osteopath, the trial court opined: "His treatment of psycho-

logical problems is limited to general areas of emotional disturbance and anxiety based on stress" and "[h]e does not have the educational background or experience to include psychiatric illnesses in his differential diagnoses of patients."

12. *See* W.Va.Code §§ 5–11–1 to –21 (1967) (Repl. Vol.2002).

354

the district court's standard of requiring proof that the plaintiff's " 'psychological well-being" ' was " 'seriously affect[ed]," 'the United States Supreme Court held that the test for recovery is whether "the [work] environment would reasonably be perceived, and is perceived, as hostile or abusive." 510 U.S. at 22, 114 S.Ct. 367. While clearly validating the relevance of inquiring into the sexual harassment plaintiff's "psychological well-being" as a means of "determining whether the plaintiff actually found the [work] environment abusive [or hostile]," the high Court was emphatic in its holding in *Harris* that the harassing conduct at issue does *not* have to be "psychologically injurious" to entitle a plaintiff to recovery. *Id.* at 22–23, 114 S.Ct. 367.

Despite its recognition that medical injury is not necessary to recover under a theory of sexual harassment, the trial court reasoned that Appellant's need to introduce expert medical testimony emerged when she limited her potential relief to damages associated with or arising from "a medical condition." Critically, however, the record of this case does not support the trial court's conclusion that Appellant structured her case in such a limited fashion—to solely seek damages for a medical condition.[13] While Appellant introduced evidence from both her family physician and from her counseling psychologist to support her claim that the actions of Mr. Ball had affected her psychological well-being, this evidence was not the extent of her damage evidence. She also introduced the testimony of co-workers who addressed the changes they witnessed in Appellant's behavior at work after the alleged actions of Mr. Ball. Their testimony, as well as the testimony of the Appellant herself, was admitted for the purpose of proving the type of incidental damages that are recoverable in a sexual

harassment case irrespective of a diagnosable medical or other psychological injury.[14]

■ Separate and apart from any evidence of psychological or medical injury, a successful plaintiff in a sexual harassment case is entitled to recover what are referred to as incidental damages for embarrassment; humiliation; loss of dignity and personhood; and emotional distress. *See* Syllabus, *State Human Rights Comm'n v. Pearlman Realty Agency,* 161 W.Va. 1, 239 S.E.2d 145 (1977) (holding that incidental damages for humiliation, embarrassment, emotional and mental distress, and loss of personal dignity could be awarded without proof of monetary loss); *see generally* W.Va.Code § 5–11–13 (stating that upon finding of unlawful discriminatory practice court may "order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay *or any other legal or equitable relief* as the court deems appropriate") (emphasis supplied); *Dobson v. Eastern Ass'd Coal Corp.,* 188 W.Va. 17, 24, 422 S.E.2d 494, 501 (1992) (holding that language of W.Va.Code § 5–11–13 permitting award of "other legal or equitable relief" refers to damages generally recoverable in tort); *Gino's Pizza v. W.Va. Human Rights Comm'n,* 187 W.Va. 312, 317, 418 S.E.2d 758, 763 (1992) (identifying damages recoverable in sexual harassment case as including "humiliation, embarrassment, emotional and mental distress and the loss of personhood and dignity"); *see also Bishop Coal Co. v. Salyers,* 181 W.Va. 71, 79, 380 S.E.2d 238, 246 (1989) (recognizing limited authority of W.Va. Human Rights Commission to award incidental damages for factors such as "mental anguish, pain and suffering, humiliation, aggravation, or inconvenience" and noting that jury must be involved where "substantial damages" are sought based on constitutional concerns).

13. In fact, the only reference in the record to Appellant proceeding based on a medical condition theory of the case is found in the opening statement that the Hospital's counsel made to the jury. The Hospital's attorney, in referring to the report of a psychiatrist whose report and testimony were never introduced to the jury, explained its theory of the case: that Appellant suffers from a medical condition—a major depressive disorder.

14. We recognized in *Brammer v. West Virginia Human Rights Commission,* 183 W.Va. 108, 394 S.E.2d 340 (1990), that the incidental damages recoverable in a sexual harassment case include damages "for humiliation, emotional and mental distress and loss of personal dignity." *Id.* at 111, 394 S.E.2d at 343.

█ Although the trial court specifically found that Appellant did not introduce evidence to support an award of noneconomic damages, we find this ruling to be in error. Our review of the record demonstrates that Appellant and her witnesses testified with regard to those elements that are typically a part of an incidental damage award in a sexual harassment case. *See Pearlman Realty,* 161 W.Va. at 1, 239 S.E.2d at 146, syllabus. Lay or expert testimony that the plaintiff in a sexual harassment case suffered resulting mental anguish, aggravation, inconvenience, humiliation, embarrassment, or loss of dignity will support an award by the jury or other fact finder of incidental noneconomic damages. Because Appellant specifically sought recovery of incidental damages,[15] and because she introduced evidence in support of her claim for such damages, it was error for the trial court to prevent her *prima facie* sexual harassment claim case from being considered by the jury.

## B. Expert Testimony

█ Despite our reversal of the lower court's ruling, we are not suggesting that Appellant is not required to connect the alleged conduct of Mr. Ball with any psychological disorder, condition, or injury she claims to have developed as a result of his alleged conduct. To recover damages for a specific psychological or medical injury, she must connect any such injury to the alleged conduct at issue. At trial, the Hospital convinced the trial court that the expert testimony offered by Appellant to demonstrate the necessary causation between the alleged injuries and Mr. Ball's alleged conduct was not sufficient. In *Totten v. Adongay,* 175 W.Va. 634, 337 S.E.2d 2 (1985), we stated: " 'All that is required to render [expert medical] testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the ... conduct of the defendant.' " *Id.* at 640, 337 S.E.2d at 8

(quoting Syl. Pt. 1, in part, *Pygman v. Helton,* 148 W.Va. 281, 134 S.E.2d 717 (1964)).

In a brief submitted by the West Virginia Employment Lawyers Association, the amicus curiae argues that Appellant's testimony coupled with that of her counseling psychologist was sufficient to give rise to a reasonable inference that the injuries of which she complained were caused by the sexually harassing conduct at issue. Based on our decision that the issuance of a directed verdict was improper, we need not determine whether the testimony of Dr. Geronilla was sufficient to create the required "reasonable inference" of causation under *Toten.* Assuming, *arguendo,* that it was, however, the Hospital through its introduction of expert testimony could certainly produce evidence tending to refute Appellant's evidence on this issue. Assuming the presentation of conflicting evidence on the issue of whether the alleged conduct of Mr. Ball resulted in the injuries about which Appellant complains upon the retrial of this matter, it is for the jury, and not for the trial court, to decide this factual issue.

█ Given the trial court's ruling that Appellant's lack of psychiatric testimony was fatal to her case, we deem it necessary to address the issue of whether the testimony of a psychiatrist is required to recover damages for a specific medical or other psychological condition in a sexual harassment case. In *United States v. Riggleman,* 411 F.2d 1190 (4th Cir.1969), the federal appellate court recognized that "the determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge; it does not depend upon his claim to the title of psychologist or psychiatrist." *Id.* at 1191. Under *Riggleman,* the decision as to whether a psychologist is qualified to testify on the issue of Appellant's alleged depression, post-trauma stress syndrome, and acute situational anxiety would be determined based upon the proffered ex-

---

**15.** As part of her complaint, Appellant sought compensatory damages for "the severe emotional and mental distress, humiliation, anxiety, embarrassment, depression, aggravation, annoyance, inconvenience, and loss of enjoyment of life, suffered by her as a result of the Defendants' unlawful acts."

pert's background, training, and expertise, and *not* on the issue of whether such individual holds a medical degree.

While we do not disagree with the trial court's conclusion that Appellant had to causally connect her alleged injuries to the Hospital through qualified expert testimony, we do believe that the court was mistaken in ruling that psychiatric testimony was required to establish a medical condition in Appellant's case of alleged sexual harassment.[16] When a plaintiff in a sexual harassment action seeks to prove a specific medical or psychological condition that falls within either the discipline of psychiatry or psychology, the qualification of a proffered expert witness to testify for the purpose of connecting the alleged sexual harassment to the specific medical or psychological condition will be determined based upon the nature and extent of the witness's education, training, and expertise. Consequently, when this matter is retried and if Appellant seeks to recover damages for her alleged injuries such as depression, post-traumatic stress disorder, and acute situational anxiety, she must introduce, through properly qualified expert testimony, evidence that specifically connects those injuries to the alleged sexual harassment of Mr. Ball. Absent such testimony, an award of damages for those alleged injuries would be improper.

## C. Reprisal Claim

In addition to the above discussed basis for reversing the lower court's decision, there is a second basis for overturning the trial court's order. Appellant argues that the lower court made no ruling in its order of January 3, 2002, with regard to her reprisal

claim. Apparently, the trial court presumed that if there was no sexual harassment, there could be no reprisal.[17] We refuted that notion in *Szabo* when we explained: "Thus, even if the circuit court was correct that there was no actionable sexual harassment, the plaintiff could still have been engaged in a protected activity if she complained about being sexually harassed." 198 W.Va. at 375, 480 S.E.2d at 814.

In *Hanlon,* we explained the rationale for encouraging the reporting of suspected sexual harassment, even prior to the time when such conduct may become actionable:

The legislative purpose in including the antiretaliation provision was obviously to encourage people to come forward and expose unlawful employment practices and to do so without fear of reprisal. By protecting reasonable, good faith opposition, the provision also advances the statutory purpose of ending discrimination by engaging private citizens to help serve as "private attorneys general." An absence of such protection would create a chilling effect on employees' willingness to join the fight. The overriding purposes of W.Va.Code, 5–11–9(7)(C), would be wholly defeated if its protection applied only to those individuals who confidently know the technical area of fair employment law and who correctly predict how its doctrine will ultimately be applied in a court of law. Given those unpredictable variables, few rational employees would take much solace in the protection from retaliation offered by such a narrow construction of W.Va.Code, 5–11–9(7)(C).

This case illustrates another example supporting the prevailing federal view, that

---

**16.** We recognize that the lower court, despite its emphasis on the need for expert testimony from a psychiatrist, may have been more concerned with the lack of specific training and expertise held by Appellant's expert witnesses than by whether those individuals held a degree in psychiatry. Obviously, a properly trained and qualified clinical psychologist could testify to many diseases or conditions of the mind.

**17.** We set forth the elements of a reprisal claim in syllabus point four of *Frank's Shoe Store v. West Virginia Human Rights Commission,* 179 W.Va. 53, 365 S.E.2d 251 (1986):

In an action to redress an unlawful retaliatory discharge under the West Virginia Human Rights Act, *W.Va.Code,* 5–11–1, *et seq.,* as amended, the burden is upon the complainant to prove by a preponderance of the evidence (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation) (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation.

is, in hostile environment harassment cases (sexual, racial, or whatever), the offensive conduct often does not rise to the level of actionability until after there has been a significant accumulation of incidents. Both employees and employers would benefit from a standard that encourages harassed employees to come forward early, well before the ephemeral line of legal liability has been crossed, in order to root out the problem before it grows into an unmanageable and costly crisis.

*Hanlon,* 195 W.Va. at 112, 464 S.E.2d at 754.

 The law is clear that a reprisal claim can stand on its own without actionable sexual harassment. By this, we mean that in those cases where a plaintiff cannot prove that he/she was the subject of sexual harassment, the law nonetheless permits that individual to prove that his/her employer took improper employment-related action against him/her based solely on the reporting of the alleged sexual harassment. Thus, even if the trial court had properly ruled against Appellant on the sexual harassment claim, she was entitled, assuming the demonstration of a *prima facie* case of reprisal, to have proceeded to the jury for a determination of whether the Hospital took retaliatory action against her based on her reporting of the alleged sexual harassment.

Based on the foregoing, the January 3, 2003, order of the Circuit Court of Cabell County is hereby reversed and this matter is remanded to the lower court for action consistent with the directives contained within this opinion.

Reversed and remanded.

STARCHER, Justice, concurring:

The record in this case could easily leave a reasonable prudent juror with the impression that the appellant, Lisa Akers, was repeatedly and continually sexually harassed at work by her supervisor. At trial, the appellant introduced evidence that she suffered from major depression, generalized anxiety, and post-traumatic stress disorder—all mental disorders recognized in the *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed., Text Revision, 2000)—caused by the

sexual harassment and retaliation to which she was subjected in the work place. At the close of the appellant's evidence, the circuit court granted a directed verdict in favor of the appellee hospital. The circuit court plainly erred in taking the case away from the jury and granting a directed verdict to Cabell Huntington Hospital.

The appellant's evidence of her mental disorders and their causation came in the form of expert testimony from a licensed psychologist, who had a Ph.D. in counseling psychology, was a staff psychologist with clinical privileges at a local hospital, and ran a full-time, continuous private practice for more than a decade. The appellant's expert gave testimony regarding mental disorders that afflicted the appellant based upon the requisite diagnostic criteria set forth in the *Manual.* At no time did the expert suggest that the appellant had some medical condition.

The trial court, upon motion from the appellee, imposed an ersatz barrier to the appellant's expert testimony on causation, through its mistaken transmogrification of *mental disorders* into *psychiatric medical conditions.* As a Ph.D. in counseling psychology, the appellant's expert was among the health care professionals for which the *Diagnostic and Statistical Manual of Mental Disorders* was designed. As such, the appellant's expert was qualified to employ both the nomenclature and the diagnostic criteria of the *Manual* in diagnosing the mental disorders with which the appellant was afflicted, and expressing an opinion as to the cause of those disorders. An expert is not required to have a medical degree in order to interpret or apply the *Manual.*

The briefs in the instant case suggest that most victims of sexual harassment are diagnosed and counseled by licensed psychologists, such as the appellant's expert, and not medically-trained psychiatrists. When sexual harassment victims are seen by a psychiatrist, if at all, it is usually only briefly and only to obtain a prescription for medication. The position taken by the appellee in this case is, *sub silentio,* an attempt to create an artificial barrier for sexual harassment litigants that has no basis in our law or rules. Had this Court adopted the appellee's posi-

tion, victims of sexual harassment would have been robbed of the most readily available, cost-effective and knowledgeable expert at their disposal as proof of a mental disorder and its cause.

As the majority opinion makes clear, the qualifications of an expert witness to testify for the purpose of connecting alleged sexual harassment to a specific mental disorder should be determined based upon the nature and extent of the witness's education, training and expertise. It is not for this Court to impose an artificial barrier, and require testimony by a medically-trained psychiatrist, when the issue in dispute is not necessarily a medically-related condition.

I therefore respectfully concur.

Chief Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

MAYNARD, Chief Justice, dissenting:

(Filed July 2, 2004)

I dissent in this case because I believe the majority has lowered the standard for admissibility of expert testimony in sexual harassment cases. While it is not necessary for a plaintiff to prove incidental damages in sexual harassment cases by expert testimony, when a plaintiff alleges that the conduct at issue proximately caused special medical damages, as in this case, expert medical testimony is required. However, according to Syllabus Point 8 in the majority opinion, the admissibility of such expert testimony will be determined "based upon the nature and extent of the witness's education, training, and expertise." The potential application of this new standard is unlimited. For example, a person educated to be a counselor for school children could provide medical testimony in these types of cases even though he or she has no specific training in the diagnosis of psychiatric conditions.

I believe that when a plaintiff such as Ms. Akers seeks damages for a specific medical condition which she contends arose from the alleged sexual harassment, expert testimony from a medical doctor is required. A psychologist like Dr. Geronilla in this case, whose credentials limit her to the discipline of counseling, is clearly not qualified to make a clinical diagnosis of a psychiatric medical condition. Thus, I fail to see how she could render an opinion that the plaintiff's major depression, acute situational anxiety, and post-traumatic stress syndrome were caused by the alleged conduct of Mr. Ball. Yet, under the new law created by the majority in this case, she may be able to render such testimony during the trial of this case.

I think that a more stringent standard for expert testimony is needed in these types of cases. Such a requirement would not place an unreasonable burden upon the plaintiff. There are at least fifteen psychiatrists in the Charleston area alone, and I am sure that a more extensive search would reveal many more qualified medical experts.

Accordingly, for the reasons set forth above, I respectfully dissent.